UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOATA
Civil No. 20-707(DSD/ECW)

Kim Diane Handy Jones, as Trustee for the
next of kin of Cordale Quinn Handy,

       Plaintiff,

v.                                **ORDER**

City of St. Paul, Minnesota; Todd Axtell,
in his individual and official capacities
as St. Paul Chief of Police; St. Paul Police
Officer Mikko Norman, in his individual and
official capacities; St. Paul Police Officer
Nathaniel Younce, in his individual and
official capacities; St. Paul Police Officer
Jordan Wild, in his individual and official
capacities,

       Defendants.

    Kevin W. O'Connor, Esq. and O'Connor Law Firm, Ltd., 19 S.
    LaSalle, Suite 1400, Chicago, IL 60603, counsel for
    plaintiff.

    Anthony G. Edwards, Saint Paul City Attorney's Office, Civil
    Litigation Division, 750 City Hall and Courthouse, 15 West
    Kellogg Blvd., Saint Paul, MN 55102, counsel for defendants.

    This matter is before the court upon the motions for partial summary judgment and to exclude expert witness testimony by defendants City of St. Paul; Todd Axtell, St. Paul Chief of Police; and St. Paul Police Officers Mikko Norman, Nathaniel Younce, and Jordan Wild. Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion for partial summary judgment and grants in part the motion to exclude expert witness testimony.

BACKGROUND

This civil rights action arises out of the death of Cordale Handy,[1] who was shot by St. Paul Police Officers Mikko Norman and Nathaniel Younce.  The parties agree that there are fact disputes precluding summary judgment on the core issue in the case, i.e., whether the officers used excessive force.  As such, the court will set forth only those facts necessary to decide the issues raised in the motions and will not discuss in detail the events leading to the shooting.

I.   **The Incident**

In the early morning of March 15, 2017, the St. Paul Police were called to an apartment building at the corner of Sixth Street and Sinnen Street after a 911 caller reported screaming in the building.  See Edwards Aff. Ex. O.  Officers Norman and Younce were nearby and responded to the call.  Younce Aff. Ex. A, at 4.

Handy and his girlfriend Markeeta Johnson-Blakney lived in the apartment building.  Johnson-Blakney Dep. at 63:14-19. According to Johnson-Blakney - and corroborated by cell phone footage - Handy woke her up at 2:00 a.m. with the belief that

---

[1]  Plaintiff Kim Diane Handy Jones brings this case as trustee for the next of kin of her son, Cordale Quinn Handy.  To avoid confusion, the court will refer to Kim Diane Handy Jones as "plaintiff" and Cordale Handy as "Handy."

someone intending to harm him was in their apartment. Id. at 20:23-21:9, 24:13-22, 26:6-27:14; Edwards Aff. Ex. M. At the time, he was under the influence of Tetrahydrocannabinol (THC) and n-ethyl pentalone (referred to as Molly), which can cause agitation, aggression, paranoia, and hallucinations, among other things. Edwards Aff. Ex. L; id. Ex. U, at 3-5. Although Johnson-Blakney assured him that no one was in the apartment, Handy armed himself with a handgun with an extended magazine. See id. Ex. M. Handy ultimately discharged the handgun in the apartment, firing sixteen shots. See id.; Johnson-Blakney Dep. at 28:3-14. He then left the apartment with the handgun and went into the street. Johnson-Blakney Dep. at 29:2-25, 33:20-34:22.

When Norman and Younce arrived at the apartment building, they met Johnson-Blakney and a neighbor, Jill Mollner, coming down the stairs, presumably to follow Handy outside. Johnson-Blakney Dep. at 35:4-20. Johnson-Blakney and Mollner testified that they told the officers that Handy had a gun, but that it was not loaded. Id. at 36:20-38:14; Mollner Dep. at 20:15-18.

Norman and Younce pursued Handy down the street, and both ultimately shot him numerous times after apparently believing that he was about to shoot Norman. Younce Aff. Ex. A, at 6-7; Norman Aff. Ex. C, at 5. After being shot, Handy rolled onto his side

3

and continued to move.  Younce Aff. Ex. A, at 7.  Not knowing whether Handy still had the gun, Younce fired one more shot at Handy.  Id.  Shortly after the shooting – within seconds according to Norman and Younce – Wild and other officers arrived on the scene.  Norman Dep. at 140:17-24; Younce Dep. at 72:3-17.  After Wild arrived, Norman and Younce handcuffed Handy and called for medical assistance at 2:26:36 a.m.  Norman Dep. at 190:15-91:7; Edwards Aff. Ex. O.  At this point approximately ten more officers were on the scene.  Younce Dep. at 209:2-20.  Younce believes that one of the newly arrived officers checked on Handy's condition while Wild stood guard over Handy's nearby gun.  Id.; Wild Dep. at 39:5-12, 40:12-15, 41:3-9, and 78:7-18.

Consistent with the protocol for officer-involved shootings, Norman and Younce were quickly removed from the scene to prevent them from talking about the incident with others before being formally interviewed.  Edwards Aff. Ex. Q; Younce Dep. at 44:3-45:4; Norman Dep. at 190:24-91:7.

Less than five minutes after the call for medical assistance, an ambulance arrived on scene.  Edwards Aff. Ex. R.  Paramedics declared Handy dead on the scene.  Id. at 2.

## II.  Officer Training

Norman and Younce completed their training to become St. Paul Police officers in the fall of 2014.  That training included, among other things, completing the Minnesota Board of Peace Officer Standards and Training (POST Board) education program.  Zauhar Aff. ¶ 3.  Relevant here, that program includes training on the use of force and dealing with individuals who are under the influence of intoxicating substances.  Id. ¶ 4.  When POST training is completed, the City of St. Paul hires candidates for police officer positions.  Id. ¶ 5.  The candidates then participate in a sixteen-week police academy, which includes additional training on the use of force.  Id.

After they became officers, Norman and Younce continued with at least thirty-two hours in-service training per year.  Id. ¶ 6. In-service training includes topics such as use of force and de-escalation.  Id.  In addition, they completed a crisis intervention team (CIT) course that instructs officers on how to properly handle people experiencing a mental health crisis.  Id. ¶ 7.  Plaintiff contends that neither officer had "specialized" training with respect to de-escalation procedures, but in doing so ignores the above-noted required training, which included de-escalation and which there is no dispute the officers completed.

See Norman Dep. at 78-19-22.

Both officers' performance reviews show no disciplinary issues and consistently positive ratings and comments. See Bosman Aff. Exs. K, L. Except for this case, there is no indication in their employment records that they were ever involved in an incident in which the excessive use of force was alleged. See id.

According to plaintiff, the St. Paul Police Department espouses a "warrior mentality" in which officers are instructed to treat suspects as enemy combatants. Drago Report, ECF No. 52-1, ¶ 5. She bases this belief on a 2012 speech made by a St. Paul police officer unrelated to this case in which he encouraged officers to treat suspects as enemy combatants. Id. There is no evidence in the record that Norman or Younce were in the audience during the speech or that they otherwise agree with or were trained under that approach. See Norman Dep. at 73:21-74:4; Younce Dep. at 137:2-39:2. Further, Todd Axtell, who has been the chief of the St. Paul Police Department since 2016, banned warrior training. Axtell Dep. at 139:4-42:4. He views police officers as guardians rather than warriors. Id. at 141:5-15. As such, he believes that police officers are collaborative partners with the community and has emphasized that philosophy throughout his tenure. Id. at 139:4-42:4.

## III. This Action

On February 20, 2020, plaintiff commenced this lawsuit in Ramsey County District Court alleging the following claims: Norman and Younce committed a battery against Handy (Count 1); Norman and Younce are liable for Handy's wrongful death (Count 2); Norman, Younce, and Wild were negligent per se in failing to render aid to Handy after the shooting (Count 3); Norman, Younce, and Wild were grossly negligent in failing to render aid to Handy after the shooting (Count 4); Chief Axtell and the City of St. Paul negligently supervised officers Norman, Younce, and Wild (Count 5); officers Norman and Younce used excessive force against Handy in violation of the Fourth and/or Fourteenth Amendments (Count 6); Norman, Younce, and Wild exhibited deliberate indifference in failing to render aid to Handy in violation of the Fourth and/or Fourteenth Amendments (Count 7); and Chief Axtel and the City of St. Paul maintained customs, policies, and/or practices regarding the use of deadly force in violation of the Fourth and/or Fourteenth Amendments (Count 8).

Defendants timely removed the case and now move for partial summary judgment and to exclude plaintiff's expert witness testimony. Defendants do not move for summary judgment on Counts 2 (wrongful death) or 6 (excessive force), as there are material

fact disputes relating to those claims. Defendants instead move on Counts 1, 3, and 4, arguing they are precluded under Minnesota's survival statute, Minn. Stat. § 573.01, and on Counts 5, 7, and 8 on the basis of immunity and lack of evidence. At the hearing, plaintiff conceded that Counts 1, 3, and 4 are subject to dismissal. The court will therefore dismiss those claims without discussion and will turn directly to the remaining counts at issue.

## DISCUSSION

### I.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere

denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

A.   **Negligent Supervision**[2]

Under Minnesota law, "[t]o prevail on a claim of negligent supervision, a plaintiff must prove that the employee's conduct was foreseeable and that the employer failed to exercise ordinary care when supervising the employee." Oslin v. State, 543 N.W.2d 408, 415 (Minn. Ct. App. 1996).

---

[2]  Plaintiff does not persist in her claims of negligent hiring, negligent equipment, or negligent retention. ECF No. 64, at 18.  Further, Minnesota law, which appears to be the basis of this claim, does not recognize a claim for negligent training. Burns v. Winroc Corp., 565 F. Supp. 2d 1056, 1068 (D. Minn. 2008); see Compl. ¶¶ 85-94; ECF No. 64, at 20-22. As a result, all that remains for discussion is the negligent supervision claim.

Plaintiff contends that there is triable issue as to whether Norman and Younce were negligently supervised by Axtell and the City of St. Paul. She cites to scant evidence in support of this claim, however. First, as noted, she relies on the 2012 speech by a St. Paul police officer not involved in this case in which he encouraged officers to treat suspects as enemy combatants consistent with the "warrior mentality." There is no evidence in the record that Norman or Younce were in the audience during the speech or that they otherwise agree with or were trained under that approach. In fact, as noted, Axtell affirmatively banned such training when he became the chief in 2016. As such, the speech does not provide a basis for defeating summary judgment on this claim.

Second, she argues that Norman and Younce were not adequately supervised in their use of force or de-escalation procedures. Rather than point to facts to support that claim, she distorts the record (as noted above) and argues that Handy would not have been killed had they been properly supervised. The court cannot assess the officers' conduct based on the outcome of the incident alone. There must be facts in the record that would tend to establish the alleged failure to supervise to survive summary judgment. There are none here.

Third, plaintiff argues that the officers' commendations following the incident, in which Axtell lauded their actions and noted that they acted consistent with department policy, shows that the department's de-escalation procedures were negligently implemented. See Bosman Aff. Ex. H. This argument, too, is unavailing. The commendation does nothing to establish that the officers were not adequately supervised relating to de-escalation.

Further, there is no evidence that the officers' shooting of Handy was a foreseeable excessive use of force, as is alleged. Neither officer has a record of engaging in unjustified or improper interactions with suspects or the community at large. Therefore, Axtell and the City of St. Paul did not fail to exhibit ordinary care in supervising them. Under these circumstances, the failure to supervise claim must be dismissed.

Because there are insufficient material facts to support plaintiff's supervision claim, the court need not assess whether statutory immunity shields Axtell and the City from liability.

**B.   Deliberate Indifference**

Plaintiff claims that officers Norman, Younce, and Wild acted with deliberate indifference to Handy's serious medical needs following the shooting. It is undisputed that none of these officers rendered aid to Handy after he was shot.

11

To establish deliberate indifference under the Due Process Clause of the Fourth and/or Fourteenth Amendments, based on inadequate medical care, courts apply the deliberate-indifference standard of the Eighth Amendment. Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009); Karels v. Storz, No. 15-3637, 2017 WL 2483792, at *5 (D. Minn. June 8, 2017). As such, plaintiff must show that (1) Handy "suffered from one or more objectively serious medical needs," and (2) Norman, Younce, and Wild "actually knew of, but deliberately disregarded, [Handy's] medical needs." Karel, 2017 WL 2483792, at *5. Under the second prong, plaintiff "must show that the officers recognized that a substantial risk of harm existed and knew that their conduct was inappropriate in light of that risk." Id. (emphasis in original).

"[D]eliberate indifference must be viewed from [defendants'] perspective at the time in question, not with hindsight's perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998). Plaintiff must meet the "extremely high standard" of showing that defendants' mental state was more than grossly negligent .... and akin to criminal recklessness." Saylor v. Nebraska, 812 F.3d 637, 644 (8th Cir. 2016) (internal quotation marks and citations omitted).

It is undisputed that Handy sustained an objectively serious medical injury when he was shot several times by Norman and Younce. Defendants argue, however, that they were not deliberately indifferent to his medical needs given the circumstances. The court agrees.

The facts establish numerous officers arrived on scene seconds after the shooting. Wild stepped in to ensure that the gun was secured while Norman and Younce were quickly removed from the scene, as is protocol.[3] Before being removed, they called for an ambulance, which arrived in less than five minutes. Unfortunately, Handy was declared dead at the scene soon thereafter.

Given these circumstances and the chaos that certainly overtakes the scene of an officer-involved shooting, there are no concrete facts in the record to establish that the officers knew that failing to render aid in the brief period between the shooting and their required removal from the scene (and in Wild's case, his role in securing the gun) was inappropriate. There is simply nothing in the record to indicate that the officers' failure to render aid in that short time constituted anything even approaching

---

[3]   Wild testified that another officer attempted to render aid to Handy.  So, even if Norman, Younce, and Wild did not provide aid, other officers may well have.

criminal recklessness.  As a result, summary judgment is warranted on plaintiff's deliberate indifference claim.

   C.   **<u>Monell</u> Liability**

   The City of St. Paul and Axtell seek summary judgment with respect to municipal liability under 28 U.S.C. § 1983.  A municipality may be held liable in a § 1983 action only when an unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." <u>Monell v. Dep't of Soc. Servs. of New York</u>, 436 U.S. 658, 690 (1978).  The policy must be the "moving force [behind] the constitutional violation." <u>Mettler v. Whitledge</u>, 165 F.3d 1197, 1204 (8th Cir. 1999) (quoting <u>Monell</u>, 436 U.S. at 694).

   As an initial matter in determining whether there is § 1983 liability, the plaintiff must identify the governmental policy in question. <u>Dick v. Watonwan County</u>, 738 F.2d 939, 943 (8th Cir. 1984).  The court then considers whether the policy is unconstitutional. <u>Id.</u>

   Here, plaintiff has failed to identify any official policy implemented by Norman and Young during the incident.  She first argues that the officers violated department policy by failing to render aid.  In so arguing, plaintiff focuses on the officers'

failure to follow existing policy, which requires them to provide aid to an injured person. Because the policy itself is not at issue, <u>Monell</u> does not apply. Second, plaintiff argues, again, that the St. Paul Police Department has adopted the warrior mentality. As discussed above, the facts in the record establish otherwise. Third, plaintiff contends that Norman and Younce were not properly trained in de-escalation procedures. This contention is also belied by the record and does not implicate <u>Monell</u> in any event. As such, the <u>Monell</u> claim also fails.

## II. Daubert Motion

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill experience, training or education may testify in the form of an opinion or otherwise." An expert may testify if:

> [T]he expert's scientific, technical, or other specialized will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)-(d).

Under Rule 702, the court acts as a gatekeeper to determine "whether the witness is qualified to offer expert testimony." <u>Schmidt v. City of Bella Villa</u>, 557 F.3d 564, 570 (8th Cir. 2009)

(citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589 (1993)).   An expert must possess the "knowledge, skill, experience, training, or education sufficient to assist the trier of fact ...." <u>Robinson v. GEICO Gen. Ins. Co.</u>, 447 F.3d 1096, 1100 (8th Cir. 2006) (citation and internal quotation marks omitted).  This standard is satisfied when the expert's testimony "advances the trier of fact's understanding to any degree." <u>Id.</u> (citation and internal quotation marks omitted).  The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. See <u>Lauzon v. Senco Prods., Inc.</u>, 270 F.3d 681, 686 (8th Cir. 2001).

### A.   Drago[4]

Plaintiff's expert witness Charles Drago opines as follows: (1) Norman and Younce failed to follow accepted police practices throughout the incident and created a dangerous situation; (2) the use of deadly force was contrary to clearly established police training and inconsistent with clearly established police practices if Handy was unarmed when he was shot; (3) the force used in handcuffing Handy after the shooting was inconsistent with police training and established police practices.   See <u>Drago</u>

---

[4] Defendants do not challenge Drago's qualifications and the court does not find them to be lacking.  The court therefore will turn directly to the substance of his report.

Report, ECF No. 52-1. Defendants argue that Drago's testimony should be excluded because he impermissibly proffers legal conclusions regarding the reasonableness of the officers' conduct under Fourth Amendment standards and his opinions would otherwise be unhelpful to the jury.

"Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotation omitted). Consequently, an expert witness's opinion as to whether a police officer's actions conformed to constitutional standards is inadmissible. Schmidt v. City of Bella Villa, 557 F.3d 564, 570 (8th Cir. 2009); Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995). The court thus finds that Drago may not testify as to whether the officers' actions violated constitutional standards. More specifically, Drago may not testify as to whether the officers' force was excessive or reasonable under the Fourth Amendment or otherwise failed to meet legal standards. Nor may he testify as to any legal conclusions he may have reached in any aspect of his proposed testimony.

However, portions of Drago's report include a recitation and explanation of arguably relevant police practices and standards. The court will allow him to provide that information to the jury

but, as noted, he may not opine as to the reasonableness of the force applied. See Thomas v. Barze, 57 F. Supp. 3d 1040, 1062 (D. Minn. 2014) ("[I]f he cannot testify as to whether force is 'objectively reasonable,' he should still be able to testify how officers are trained, what force options are available to them, and what is consistent with training procedures.").

**B.   Wright**

Plaintiff's expert R.K. Wright, M.D., J.D., proffers an opinion regarding the trajectory of the bullets fired by the officers. Defendants argue that the testimony should be excluded as unhelpful to the jury. Defendants specifically argue that Wright did not examine Handy's body and therefore cannot credibly provide an opinion that differs from that of the medical examiner. The court disagrees. Even though Wright did not examine Handy's body, he reviewed the autopsy report, photographs of the body and the scene, and other relevant evidence. In the court's view, this provides a sufficient basis for his opinion and proposed testimony. Any weaknesses in his opinion are fodder for cross-examination rather than exclusion.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED that**:

1.    The amended motion for partial summary judgment [ECF No. 46] is granted; and

2.    The motion to exclude expert testimony [ECF No. 54] is granted in part as set forth above.


Dated: June 30, 2022

                                          s/David S. Doty
                                          David S. Doty, Judge
                                          United States District Court

19