UNITED STATES DISTRICT COURT
DISTRICT of MINNESOTA

--------------------------------------------------------------

Kim Diane Handy Jones, as ) File No. 20-cv-707
Trustee for the next of kin of ) (DSD/ECW)
Cordale Quinn Handy, )
)
     Plaintiff, )
)
vs. )
)
City of St. Paul, Minnesota; )
St. Paul Police Officer Mikko )
Norman, in his individual and ) Courtroom 14W
official capacities; St. Paul ) Minneapolis, Minnesota
Police Officer Nathaniel ) August 1, 2023
Younce, in his individual and ) 9:01 a.m.
official capacities, )
)
     Defendants. )

--------------------------------------------------------------

BEFORE THE HONORABLE DAVID S. DOTY
UNITED STATES DISTRICT COURT SENIOR JUDGE

**JURY TRIAL**
**VOL. VI**

**APPEARANCES:**

For the Plaintiff: O'CONNOR LAW FIRM, LTD
By:  Kevin O'Connor, Esq.
100 S. Wacker Drive, #350
Chicago, Illinois 60606

And Paul Bosman, Attorney at Law
2136 Ford Parkway, #5328
St. Paul, Minnesota 55116

For the Defendants: ST. PAUL CITY ATTORNEY'S OFFICE
By:  Anthony Edwards, Esq.
15 Kellogg Boulevard W, #400
St. Paul, Minnesota 55102

Court Reporter: LORI A. SIMPSON, RMR-CRR
Warren E. Burger U.S. Courthouse
316 North Robert Street, #146
St. Paul, Minnesota 55101

Proceedings reported by certified stenographer;
transcript produced with computer.

**I N D E X**

|                                              | PAGE |
|----------------------------------------------|------|
| CLOSING ARGUMENT BY MR. O'CONNOR             | 795  |
| CLOSING ARGUMENT BY MR. EDWARDS              | 811  |
| REBUTTAL CLOSING ARGUMENT BY MR. O'CONNOR    | 827  |
| JURY CHARGE                                   | 830  |

**P R O C E E D I N G S**

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: Good morning. Do you want to take your seats, please.

We left with a motion pending, and I think you should -- you deserve a response considering that motion before we start today. So I just want to tell you the motion that was made by defense for an inconsistent verdict, I'm going to deny that motion.

I do believe that the jury had facts before it from which they could find that there was a difference between the two named defendants, that one would be liable and the other not liable, and so I believe that the facts were there and it was not an inconsistent verdict.

So we're going to go ahead. I think you probably assumed we were going to do that anyway. I hope you did. We're ready to go ahead and present evidence on damages?

MR. O'CONNOR: Yes, Your Honor. I have an issue with the verdict form on the damages.

THE COURT: Yeah. And did you have a chance to talk with Mr. Edwards?

MR. O'CONNOR: I did, and he said that they found -- I'll let him speak.

THE COURT: Why don't you --

MR. EDWARDS:  Yes, Your Honor.  I'm mindful of the basis for the jury's findings with respect to liability --

THE COURT:  Right.

MR. EDWARDS:  -- but I believe, consistent with the verdict form on damages that was agreed to, that they should be asked whether Officer Younce's conduct was malicious or recklessly indifferent.

I understand that those terms would be a prerequisite of having found wrongful death, but I think under the circumstances they should be asked that question with respect to punitive damages separately because I don't know that it's necessarily the case that a verdict having concluded there was a wrongful death is going to yield a finding on their part that there was malice or reckless indifference with respect to the punitive damages standard.

THE COURT:  So you believe that we should have the form that was provided initially?

MR. EDWARDS:  Yes, Your Honor.

THE COURT:  Are you okay with that form?

MR. EDWARDS:  Yes, I am, Your Honor.  I don't know whether there's any point in having Mr. Norman's name on it, but other than that, yes.

THE COURT:  Jessica, did you take that form out of my little packet?

LAW CLERK:  I didn't mean to.  Did you mean in the

caption?

MR. O'CONNOR:  Judge, in response --

THE COURT:  Hang on.

MR. EDWARDS:  No.  I mean -- actually, I take that back.  The version that I have here does have just Younce. I don't mean in the caption.  I mean in the questions.  But the version that I have here, which is the version we got yesterday, doesn't have him.

THE COURT:  That has two questions, right?

MR. EDWARDS:  The one that I have from yesterday has three questions.

THE COURT:  Three, yeah.  Okay.  I just wanted to make sure I had it in front of me, because I have an alternative that follows what you requested this morning.

Go ahead, if you would, Mr. O'Connor.

MR. O'CONNOR:  Judge, and the reason is if the jury finds that conduct based on the liability aspect, it holds true for the damages.  It's not like they have to re-find it in the damages.  It's a finding they made.

So what you have here -- and counsel's fear is this is suggesting that they have to award punitives.  It does not because the language used, it says, "what, if any, amount of punitive damages is awarded."  So they can simply award a zero if they wish to award a zero.

But to have them re-find again the same thing they

had to find under the wrongful death statute where they have already answered that question, that they found that he violated the provisions of the Minnesota wrongful death, would be inappropriate and it could cause an inconsistent verdict.

THE COURT:  Well, how do you think it could cause an inconsistent verdict?  Because we are just asking them to say it again.  I think that's Mr. Edwards' point.

MR. EDWARDS:  And, Your Honor, if I might add just one quick thing?

THE COURT:  Go ahead.

MR. EDWARDS:  You'll remember in closing argument counsel used the word "negligence."  He said, well, you may not find that they did this intentionally, but rather that their conduct was negligent.  And I asked the Court to give a curative instruction because that's not consistent with the burden of proof.  But that is the argument counsel made.

We don't know at this point whether in their minds they found this malice or reckless indifference or whether, consistent with counsel's arguments, they simply disregarded the instructions and found that there was negligence.  I think we need another opportunity to ask them that question in order to establish a basis for punitive damages.

THE COURT:  Go ahead, Mr. O'Connor.

MR. O'CONNOR:  And counsel said I had to prove

murder.  So we're at -- the jury was given --

THE COURT:  No, no, don't go there.

MR. O'CONNOR:  I know.

*(Simultaneous indiscernible crosstalk)*

MR. O'CONNOR:  The jury was given a question.

THE COURT:  Yes.

MR. O'CONNOR:  The jury found it.  You are not -- instructions are not to overly emphasize any issue to the jury.  You're not to give them the same question twice.  That is an inappropriate use of jury --

THE COURT:  Well, and of course I think -- I'm going to deny your request.  I'm going to give the question, asking it twice, because with what they were doing and how they came out on the first question of liability, I think that they should be reminded, and that's all it comes down to, reminded of what the standard is for a finding of punitive damages.  That's really what we're doing for them, is reminding them.  And it's like -- because I am going to remind them again in the instruction itself that they're going to get as to what they have to find to find punitive damages.  So the form echoes the instruction, and I think that's appropriate.  Okay?

MR. O'CONNOR:  I understand your ruling, but I think that --

THE COURT:  I understand.  You know, we have so

many hooks in this case already, that you've got another --
I just maybe gave you another hook.  So at any rate -- all
right.  Let's call the jury in.

MR. EDWARDS:  Your Honor, just a couple more quick
housekeeping things --

THE COURT:  Oh, wait a minute.

MR. EDWARDS:  -- if you don't mind, before the
jury is brought in.

In light of the verdict yesterday, which honestly
was not one we would have anticipated, at least on my table
we would have anticipated --

THE COURT:  Of course.

MR. EDWARDS:  -- I would ask that when the jury
reaches its conclusion on damages, that it be polled both
with respect to damages and liability.

THE COURT:  All right.

MR. EDWARDS:  Also, we previously had talked about
a brief in support of a motion for judgment notwithstanding
the verdict --

THE COURT:  Yes.

MR. EDWARDS:  -- in association with the
inconsistent verdict.  And I'd just respectfully ask that
rather than being due in one week, that that be due a week
from this coming Friday, so that would be August 11th, just
to give me a little additional time, if that's acceptable to

the Court and counsel.

THE COURT:  Well, it's okay by me.  The whole thing is I don't want to enter judgment or have judgment entered based on the jury verdict until such time as we have a chance to decide that issue, and I think that's appropriate.  You tell me if I'm being too cautious.

I've never been accused of being too cautious.  My problem is I have the opposite.  So I tend to be more cautious because at one point in time they used to call me a gunner judge, shoot from the hip.  But anyway -- shoot from the brain, actually.

Do you disagree?  Would you like to have some more time too?

MR. O'CONNOR:  No, Judge, I believe it should be a judgment on the verdict and then this would be a post-trial motion asking the Court to overturn that verdict, which would not prevent the Court from entering a judgment on the verdict.  But in any event, you can always --

THE COURT:  Well, and of course that's true too, we could merge the two, the motion for -- what you are asking for, in effect, was a verdict on -- good lord, I am losing the language.  It's changed.  It used to be NOV.

MR. O'CONNOR:  JNOV.

THE COURT:  That was the old language.  But anyway, that's what you were asking for initially and --

MR. EDWARDS:  It is.

THE COURT:  Is there any problem with having it merged for a motion for reversal of the verdict and the judge's --

MR. EDWARDS:  The only thing I would say, Your Honor, is if we do that, which I'm amenable to if that's what the Court would prefer, then the rules provide that we would have 28 days to file that motion.  I mean, that would be a more exhaustive kind of omnibus motion that would require additional time.

THE COURT:  Right.

MR. EDWARDS:  So when we had talked about a week, I'm not going to be able to --

THE COURT:  That would --

MR. EDWARDS:  -- nor would the rules require me, to file that that quickly.

THE COURT:  That would solve your problem automatically by the rules, right, give you more time?

MR. EDWARDS:  Well, I suppose, yeah.  I mean, they are two different motions, but to the extent the Court believes it makes sense to have those combined into one, I am okay with that so long as I'm not asked to file it within a week or ten days or what have you, but --

THE COURT:  Well --

MR. EDWARDS:  -- rather the 28 days after the

entry of judgment that's provided for under the rules.

THE COURT:  I think Mr. O'Connor's suggestion makes sense from a procedural point of view, and I don't want to make it more complicated for you or give you -- and I want to give you some time.  I want to give you enough time that you can do it and so -- I'll leave it at that.

I'll think about it and we'll let you know, but otherwise I'll probably do what Mr. O'Connor suggests, that is, we'll just not hold -- we'll not ask you to brief right after the trial, but to brief and bring on another motion, an NOV.

MR. EDWARDS:  Yes, Your Honor.

THE COURT:  Okay.

MR. EDWARDS:  So there be many components to it, but in any case, yeah, I am certainly amenable to that.  I think there may be some wisdom in combining those so that it's not overlapping multiple motions that are being filed --

THE COURT:  Exactly.

MR. EDWARDS:  -- and being responded to.

THE COURT:  Exactly.  It makes sense, I think, procedurally as well as from the law.

Okay.  Does that make sense to you also?

MR. O'CONNOR:  Yes, sir.

THE COURT:  Make sense to you, Jessica?

LAW CLERK:  Um-hmm.

THE COURT:  I want to know if my left hand agrees with me that we are making sense.  If we do some research or something and think about it -- as we think about it come to a different conclusion, I will let you know before we end today.  Okay?

All right.  Let's call the jury.  Are we ready to proceed to argue?

MR. O'CONNOR:  Yes, Your Honor.

MR. EDWARDS:  Yes, Your Honor.

*(Pause in proceedings)*

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT:  Why don't you take your seats, please.  Again, Members of the Jury, you deserve congratulations.  You are all here on time.  Amazing.  Thank you.

You might note we have a different court reporter this morning.  Lori Simpson is her name.  She's outstanding, a real professional and -- but just so you don't sit there wondering what's going on.  Did Brittany change her hairstyle?  No.

But anyway, go ahead, please.

MR. O'CONNOR:  May it please the Court --

THE COURT:  Counsel.

MR. O'CONNOR:  -- Counsel, Ladies and Gentlemen of

the Jury.

We now talk about money damages. There's no magic wand that any of you can raise that can bring Cordale Handy back. Our system of justice provides that in a situation like this, all you can do is award money damages.

What would his mom want? Nothing more than to see him walk through that door, to be able to talk to him, to be able to have that -- have him at the table, to have that seat at Christmas, to be able to hug him again, like those big hugs they would have.

But our system doesn't provide that. There is no magic wand. What does it provide? It provides that you award money damages to try and make a family whole. There's no magic on justice. There's only the reality that he's no longer going to walk through the door, sit at the kitchen table, or give the rest of the family that big hug.

Defendants believe that Cordale has no value because he had a criminal background. There's other people in society that perhaps don't have value either: Robert Downey, Jr., the Iron Man, convicted of gun, heroin, cocaine; Tim Allen, *Home Improvement* man, convicted two years federal prison for drug trafficking; Christian Slater; David Carradine. I can go down the list.

I think there's a statistic that said one-third of adult males have a felony conviction in the United States as

of 2010.  Why?  There's a whole debate as to why or what's going on in the system.  Who are some of the notable black males?  Snoop Dogg, Lil Wayne, James Brown, Allen Iverson.  The more notable:  Nelson Mandela freed South Africa from apartheid, spent 27 years in prison.  George Floyd, convicted of eight crimes, spent four years in prison, but inspired a revolution that started here in Minnesota.  Drug possession, theft, trespass, aggravated robbery in his past.  Martin Luther King, Jr. went to jail 29 times, the greatest civil rights leader of our country has ever had who gave his life for what he believed in.  And so on and so on.

So to say that because somebody has a thing, drug, whatever, in their background, whatever, a criminal conviction does not mean they don't have a value.  And what is the value?  The value is not what counsel thinks the value of his life is.  Frankly, it's not even what I think the value of his life is.  It's what his life meant to his family, how special he was to his family.

The damages awarded here are not for him necessarily.  It's for the family's loss and what that family felt and what the family believed and what the family's true loss was related to this case.

We speak of money damages today because the defendant didn't value his life six years ago when they didn't even care to know his name.  They still don't care to

know who he really was.

I spent the last six years trying to learn who he was, and I get a glimpse of who he was and I think I have a good idea of who he was when I learn about him giving his Sean John coat to a homeless guy that his mom spent a lot of money on because he felt bad for the man, when he deals with Jill and takes the time to try and talk her off the ledge, things he didn't have to do.  I learned a lot about him.

We're not just defined by what we do.  I hope some day I'm not just defined as a lawyer or the judge is not just defined as a judge or each one of you defined by your job, but defined by who you are as a person and how good of a person you really are within.  If all we are is our job, we're not much.  If all we are is what we do, we're not much.  It's who we are, who we are as a person and how we treat others; and that's really what Cordale was all about.  He's defined by how he treated others, and you heard the testimony about how he treated others.

Sympathy should play no part in your decision on damages here.  I'm not asking for your sympathy.  The family doesn't want your sympathy.  The family has gotten a lot of sympathy over the last six years at his funeral, at the various points in this case.  The memorial every year is an honorary of him.  The family has received about as much sympathy for probably ten lifetimes from people around the

country who have cared about his life and about what happened to him. They don't need that. They need justice. Justice is what you are here to provide related to this family.

What factors should you consider is the relationship between Cordale and his mom and siblings. That relationship is what matters. He was really a hero to his siblings. I mean, his mom still wears the angel ring she gave him before he died. She still wears the boot, the shoe that he gave her around her neck. She has the pendent charm with all the different elements related to him.

You have seen the pain of her loss of what she felt losing her son. He was her protector. He was the person who came to her when she's going through surgery and took care of her. It's the thing that kids should do. It's what kids should do for their parents.

You've heard about his sister, how close they were and how she went south and started drinking once he was gone and couldn't really deal with it.

You heard about his brother JaJuan who played the video games with him every day and how special their relationship was that he kissed him on the lips when he took him to a concert.

You heard about his little brothers, who he tried to provide guidance to when they were in trouble because

they came from that foster system and he tried to lead them on the right path and you heard about they have a difficult time.

His sister even moved out. I mean, they couldn't handle seeing him, seeing him every day when they walk through. It's special to his mom to see who was there when you -- when she had this. To her -- this (indicating) is what's outside her home. This is Cordale outside of her house in the flower bed as she walks up every day, and she wants everybody else to remember who he was, remember his name, remember the importance he had, the loving son, brother that he was to his family. And everybody that walks in that house sees that, no matter how painful that is. They haven't forgot about him. They have not forgot about him.

Kim is the named party in this case, but the real party in interest is five people. When a tragedy like this happens, it doesn't affect just one person. It's not just the person that died; it affects a whole family. And the five people we've talked about -- we have Kim. I have gone through the amount of struggle that she's had and she described.

One of the things that -- the government doesn't do a lot of things right, but the one thing they do is keep good statistics. Statistics-wise we know that Cordale had

an average life expectancy of 41.6 years, and I think what the law is going to be instructed to you by the Judge is you can consider how long he was going to live and the person who has got the loss, how long they're going to live.

We heard that Kim Handy, she being a black female, 58 to 59, has an average life expectancy of 22.8 years. So she has 22.8 years of a loss. JaJuan, his brother, has an average life expectancy of 31.5 years. He's got 31.5 years of a loss. Isaiah, Angel, and Whitney all have a longer life expectancy than he did because they're younger than him. They have that 41.6 years of loss as to what is normal life expectancy.

Normal life expectancy is considering your health, habits, everything else. You've had the -- you had the autopsy report. He doesn't even have a cavity. He doesn't have heart problems. He didn't have any other issues. He was a very healthy young man. He would live his life expectancy, if not more, related to this particular case.

St. Paul took a gamble on the night that this happened. They took a gamble that nobody would uncover what really happened. The officers got together. We heard from people saying he's falling to the ground when he's shot. We're hearing taking photos of just half of the gun so we don't see the broken part. We see that people get up there and tell the story about, yeah, I saw him point the gun at

me and then get on the stand and say, well, maybe I was wrong, maybe I didn't recollect that appropriately.

We see that they have from six years ago made him a statistic. They didn't care about his name. He was nothing more than a statistic to St. Paul. And at that point what that statistic became is they want to continue now, as we're here in court, talking about damages.

Normally when you have a point where somebody is found liable and you are talking about damages, people ask for remorse, people ask for forgiveness, people ask for some kind of reaching out to the jury to say, hey, look, what we did, we understand we did wrong, give us some of your remorse for us.

But, no, that's not what we got here. They doubled down. They doubled down twice. They're trying now in the damages phase to punish him again, punish the family again, try and drag his name through the mud, trying to do whatever they can to put him on trial.

Why is it that the defense is trying to put him on trial when they're the ones on trial? They're turning it around trying to say, no, we're prosecuting him again, we're going to try him in his death. Despite the fact that we killed him, we're going to prosecute him again.

And you know when we're going to do it? When he's not here so he has no chance to defend himself. He's got no

chance to tell his story.  So when they bring things up or documents or things, you know what?  He can't refute it.  He can't refute it.  It's great, he can't tell you what his life was like, can't tell you what was going on, can't respond to the allegations that they make against him.

They took that gamble, hoping that they can persuade you to bury this case, sweep this case under the rug, like he got buried, and hopefully it would all go away without any consequences.

What message does it send to the community if people who swear to serve and protect can be allowed to wrongfully take somebody's life with little to no consequences?  What does that say to his family?  What does that say to his brothers and sisters?  What does that say to the rest of our community, if what they can do is take somebody's death wrongfully and then not have to pay for it?

It sends a message that, you know what, justice isn't blind, everybody isn't treated equal.  People who -- certain people in this community will get justice, but others will not.  That's not true justice.  That's not why you're here.

We talk about -- I have to talk about what's the value of the loss to this family.  We think about -- he's been called various names.  He's been called a lunatic. He's been called various things related to this case without

the ability to defend himself.

I remember other people who have been called a lunatic. van Gogh was called a lunatic. He cut off his own ear to, like, impress his girlfriend or whatever it was, but yet that lunatic's painting sells for $50 million at the last go-around, whatever it was. That's the lunatics in our society. That's what our society values for a painting, a painting from a lunatic, let alone somebody's life and what they provide to a family.

And if somebody came back and said, you know what, I will give you half, I'll give you 25 for that van Gogh painting, they'd be like, what, are you kidding me? It's worth 50. It's worth 50. They'd say I'll give you half. Well, half justice isn't whole justice. Half value isn't full value related to this particular case.

St. Paul Department did not value him that night. But you know what? They are going to have to value him today because you're here to make sure that they value his life today. You're going to have to make them value his life.

When it comes to the damages in this case, there's two elements that you found against him. One is related to his constitutional rights violation. His constitutional rights have been violated, the very framework of this country. We are all given that constitutional right to be

free from excessive force from the police department.

And when somebody with a badge and a gun -- the only people in this world who can take your freedom without a trial, a jury, a judge is a police officer. They're the only people that can arrest you and take your freedom without you being able to say a word about it. That is a very strong power that they have.

But with that power comes a great responsibility. You can't look at that as just something routine. And with that responsibility, they need to be responsible for the actions that they had.

As to the constitutional claim and the wrongful death claim, the wrongful death claim is the loss that the family has, and there's many elements that we talked about related to her and I believe the Judge is going to instruct you on what things you can consider.

The most -- the smallest element of this case, the smallest element is what financial contributions he was going to make to his family. This is not a person who died with a wife and kids, who was supporting them and they're going to need to support the rest of his life. That element is simply gifts, things he would give to his mom.

It's the most insignificant of this case, but that's the element that the defense wants to harp on because they say, you know what, he had a felony in his background.

He wasn't going to have a job.  He wasn't going to be one of these people that I've named that have made it in life.  He's just financially not going to be supporting the family.  Nobody said he was.  Nobody claimed he was.

But that element only relates to that element.  Nothing about anything of his past has anything to do with the relationship he had with his family, and that's the element of damages that I'm going to ask you to focus on; and that element says look at his health, look at his age, look at his habits, look at his talents, look at his successes, look at things that -- his relationship, his counsel to his family, his relationships between him and his family.  That's his guidance, his aid, his advice, his comfort, his assistance, his companionship, his protection.  This is the type of things that are the real damages in this case and the real loss from a family.

Family members are not judged simply by what they can financially contribute to you.  It's that nonfinancial part that really matters and really what makes somebody family.  That's the definition of family.

As it relates to this case, I suggest to you that a fair and reasonable award for each of his brothers and sisters -- and we have four of them.  We have JaJuan, Isaiah, Angel, and Whitney.  And the Judge just has you do a general award and then it is divided based on what the Judge

recommends between the various people, the next of kin, that are entitled to recover.

But I suggest for each one of those people for the next 41.6 years, and with JaJuan it's 31.5, that an award of $2 million related to the loss of their brother for each one of those.

And as to Kim, Kim has a much greater loss. She can't get over this. She won't get over this. She's going to continue to -- she's established a foundation for him. She's continued to try and make his life, the love that he expressed in his life, the giving that he did to other people to continue by providing headstones to other people. She wants to carry on that name. She has to live with that memory, that empty seat, that mom -- the mama's boy. I suggest that her loss is double that of his siblings or $4 million.

The next element -- and some of you may say you know what? I think that's too high. Some of you may say I think that's too low. I think it's a fair and reasonable number collectively as to what the loss has been related to this family and what it will be for the next between 30 and 40 years, 20 for Kim, but 30 to 40 for the rest of the family.

The second element of this case is what they call punitive damages. And earlier in this trial you were asked

whether the conduct of Nathaniel Younce under that wrongful death provision was willful or malicious, and you guys checked that answer that it was.  And under that standard, I think you're going to be asked again in terms of a verdict form.

The first number, when you relate to the damages, is going to talk about what will fairly and accurately compensate the next of kin.  That's the number I was talking about related to the family.  That's the first element.

The second element is the Court is kind of asking the question again.  You were asked this question before.  You're going to be asked this question again on the damages part that you responded to in the liability section.  "Do you find by a preponderance of the evidence that Defendant Nathaniel Younce's conduct was malicious or recklessly indifferent?"  Was it reckless?  Was the conduct reckless in shooting him?  I think you've already answered that.  I think that's an easy answer, that the answer is "yes."

The next question becomes what amount of punitive damages should be awarded.  Punitive damages.  What does punitive damages mean?  Remember the scales of justice we were talking about?  What better way to bring those scales of justice back into balance than to right a wrong, than punishing the defendant, paying it forward to the woman who has been paying it forward on his behalf all along?

Money is the only thing the defendants care about, and it's the only element that really is going to change anything related to this case to prevent it from happening in the future, to prevent these cover-ups.  It's the only way to deter this behavior in the future.

It's the safety in the community and the preservation of life that must be a priority.  That has to be what is expressed to this community, told to this community, sent as a message to this community by your verdict.

A verdict means -- it is supposed to be justice. Justice is truth.  Justice is, when it comes to punitive damages, to deter, to prevent, to prevent this from happening again.

We want you to punish the defendants, to put the scales back in balance, to put the scales of justice back in balance to helping the family, by helping a woman who spent every day since her son's shooting trying to pay forward the harm that she suffered and her family suffered because of the defendants' actions.

I describe sometimes the cover-up is worse than the act itself.  When you talk about in this case all of the cover-ups, Vang, the photos of the gun, hiring experts that charged almost $3,000 a day to tell you, you know what, it's okay what they did, changing their perspective or story or

memory, protecting the imaginary homeless guy on 7th Street. That's who they were protecting that day, the imaginary guy, instead of Cordale Handy.

Making this case real for them, not imaginary, that's what I'm asking you to do. Make St. Paul Police Department get the message this is not an imaginary case, this is not an imaginary individual. This is somebody real. You have destroyed a family. And unlike some of the evidence and the stories they've told, this is real. Award Kim and the family the amount that sends a message related to this case.

I ask as it relates -- that's up to you, what message it's going to send and what message the amount is really going to put the scales of justice back into place. What is going to tell the police department that this won't be tolerated? Is that number equal to the compensatory damages I recommended? Maybe. Is it half of it? Maybe. Is it twice as much? Maybe.

Somewhere in there, with your collective wisdom, you're going to find that that is the message that needs to be sent related to this case. It is the message that this is not going to be tolerated.

This case is unique because over the past I don't know how many years police officers have not been held accountable unless they were caught on tape doing something,

unless they were caught on video doing something.

This is one of the unique cases where the physical evidence helped prove something that the people couldn't see on a camera, because when the officers come forward and tell a different story, people would say:  Well, why would they lie?  Why would they tell that story?  Why would they cover up?  Why would they do these kinds of things?  All of those people, all of those messages said, you know what, if your body camera isn't on or if you don't have one, you're okay, you're okay.  But not today.  Not today and not this case.

They got caught.  They got caught because the evidence didn't add up.  The evidence was inconsistent with what they said and they finally had to confess.  Officer Younce finally had to confess on the stand that, yep, that evidence doesn't point to what I said happened.  Finally.

But the message has to be sent punitive-wise that you don't get away with covering this stuff up, you don't get away with making up these stories when that isn't what happened; and that is the way that we deter this future -- in the future so that other families don't have to suffer like this family is suffering.

Thank you.

MR. EDWARDS:  May it please the Court, Counsel.

THE COURT:  Counsel.

MR. EDWARDS:  Ladies and Gentlemen of the Jury,

you can breathe a sigh of relief because this is the last time you are going to hear from me in this case.

I have a lot to say, but ultimately I'm not the one who is important here.  You are the ones who are important here.  You are the ones who have to make what is effectively an impossible determination, and that is what is the value of this case, what is the value of this loss to Mr. Handy's family.

And you heard counsel talk about the notion that I would say, well, this was worthless, he was meaningless, they only care about money.  I don't agree with those things.

Counsel made reference to the fact that I had used the word "lunatic" to describe Mr. Handy.  I want to apologize for that choice of words.  The context in which I said that was talking about what these officers were confronted with that night, which was a man under the influence of a drug who, according to their own expert, would make him psychotic.  He wasn't a lunatic and that was a poor choice of words on my part, and so I apologize to Ms. Handy to the extent that -- Ms. Handy Jones because that was a wrong choice of words for me.

In any case, you do have to decide here what is the value of this loss and you have to decide whether, based on what you know about Mr. Handy, based on what you know

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

about the choices that he made during his life, whether it is fair to compare him to Martin Luther King or Nelson Mandela or not, whether there's evidence to show that his life was unequivocally positive for his family.

I have the greatest respect for Ms. Handy Jones and what she's done and the suffering that she's gone through.

Mr. Handy died on March 15th of 2017. And on June 23rd of that same year, 2017, I lost my sister. My sister was mentally ill.

MR. O'CONNOR: Objection, Your Honor. This is an inappropriate comment about personal things of a lawyer.

MR. EDWARDS: Your Honor, he made a comment about all kinds of things --

THE COURT: I am going to overrule. This is final argument. Go ahead.

MR. EDWARDS: My sister was 49 when she died. She had suffered from mental illness throughout her life, and ultimately she starved herself to death and I had to tell my mother the next day that Kate had died. And my mother cried and she said, I'm not sorry because she died. I'm sorry for the way she lived.

So how does that bear? I'm showing you here the actual instructions that you're going to be read by the Court in this case, and those include the factors that you

are to consider in determining the value of Mr. Handy's life.  And specifically I'm going to point you to these enumerated factors.  Consider the following factors in making your determination of the losses suffered by Mr. Handy's death:

"Number 1, his past financial contributions to the family."  Now, counsel has already told you he views that as the smallest part of this case.

Mr. Handy was a person who was getting back on his feet.  He was working for the Salvation Army.  We've not gotten any evidence regarding what he was actually making, and we do have testimony to the effect that he was not regularly contributing to his family.

So, as counsel said, we're not talking about a spouse who was a highly compensated professional that was providing for a wife and children.  We're talking about something different.

And you don't have any evidence on which to evaluate number 1 because although the plaintiff could have put in some evidence about his income, about specific financial contributions he was making to his family, he chose not to -- or Ms. Handy Jones chose not to and so you really don't have any evidence about that.

Now, these next few get to why I brought up my sister Kate.

"Number 2, his life expectancy at the time of his death.

"Number 3, his health, age, habits, talents, and success.

"Number 4, reasonable expenses incurred for his funeral and burial."  We've heard something about that. You'll have to evaluate it.

But 5 and 6 are the ones that I think are maybe most salient here:  "The counsel, guidance, and aid he would have given his family; and the advice, comfort, assistance, companionship, and protection that he would have provided to his family if he had lived."

It says you should consider the amount of time the family members might be expected to survive together, their life expectancies.

And it goes on to say, "Do not include monetary amounts relating to the following:  Punishment for defendants; grief or emotional distress of the family; or the pain and suffering of Mr. Handy before his death."

Ultimately this is about what Mr. Handy's life meant to his family, and I have the greatest empathy for Ms. Handy Jones and her loss, but we have to acknowledge the reality of who Mr. Handy was.

You have evidence in the record regarding his criminal background in Illinois, and I'm not bringing any of

that up to say he was a terrible person or a person that couldn't be redeemed, but it is part of the reality of who he was.

People that have felony convictions are impaired in their ability to become gainfully employed, and the reality is the quality of his relationship with his family while he was alive had to have been affected by the fact that he spent much of his adult life in prison.

And we have other evidence that shows us something about his lifestyle. One of the things, as I said, that you're asked to consider is his habits; his life expectancy; the advice, comfort, assistance, companionship, and protection that he would have provided to his family.

Think about that night. The evidence that is undisputed that night was that he had taken this bath salts drug that, according to the defendants' expert, made him psychotic. He had a gun, which felons are not allowed to have, and he used that gun to fire off a number of rounds in his apartment. Thank god he didn't hurt anyone, but he easily could have.

And while he was doing those things, he was on the phone with his mom. Why do I bring that up? Because with my sister Kate there were a lot of phone calls, a lot of calls in the middle of the night about a crisis. I'm high and I can't figure out how to get home. I've hurt myself.

There were a lot of calls to bail her out or to come and pick her up.

And ultimately, by the time she died, my parents' relationship with her was such that those phone calls were not something to look forward to.  They were something that they feared.

And I understand Ms. Handy Jones loved her son very much and her memory of him is of the good times with him, but imagine what she experienced on that phone call that night.

And you have to ask yourselves is that -- when you look at those bags of drugs in the apartment, is that the only time weird behavior happened?  Was this a one-night aberration?  Because at some point he had to have acquired that illegal gun.

Is the message you are being sent about his lifestyle, that he had corrected his ways and was on his way up to rebuilding himself after his legal problems in Illinois, is that accurate?  You have to decide that.

But I just submit to you that you can't view the value of his relationship with his family wholistically without being frank about the downsides of who he was and the lifestyle that he had chosen to lead.  You can't do it.

We were told he was a hero to his siblings.  Maybe he was.  Does that seem like an unequivocally positive

thing?  With the greatest respect, an older sibling who spent years in prison, who is high on bath salts, who is illegally in possession of a gun, who is acting completely crazy and calling up his mom is a complicated hero, if we want to call him a hero.  Those things are just something that you have to factor in here.

And while we heard from Ms. Handy Jones -- and I am not here to suggest her testimony was anything other than accurate -- we didn't hear from these siblings that we were told considered him a hero.  They could have been brought in here to testify.  They weren't.  So we don't really know what they would have to say.

Again, I don't for one second doubt the sincerity of Ms. Handy Jones and her sorrow for losing her son, but, again, this was a complicated person.  Their relationship had to be complicated.  And so as much as I'm sure she misses those great calls saying, "I love you, mom," I doubt she misses calls like the one that she got that night.

So what should you do?  What I've put in front of you is the special verdict form that you're going to be asked to complete in this case.

The first component is what are called compensatory damages.  Now, what "compensatory" means is it's compensating, it's compensating the family for their loss.  And, again, I've already shown you the factors that

you are to consider in determining the value of the compensatory damages in this case.

Counsel has asked you for $12 million in compensatory damages because he had four siblings.  They want $2 million for each of the siblings and $4 million for Ms. Handy Jones.

I'm not going to give you a number because ultimately you are going to have to be the ones who decide this case, but what I will caution you is that whatever that number is, you must consider the wholistic nature of the situation.  You must consider Mr. Handy as a whole person.

Because the smiling version, hugging his mom was real.  The version that was high on bath salts and firing a gun at a hallucination was also real, and that is part of the loss that this family endured.  As I said, some of the phone calls, some of the visits with mom I'm sure were beautiful, but some of them most definitely were not and that's all part of the whole that you are going to be required to consider here.

Do I think the number should be millions of dollars?  Well, I have a bias.  I don't because ultimately, again, I think of my sister and I think of the loss --

MR. O'CONNOR:  Judge, that's an improper comparison to an unrelated case.

MR. EDWARDS:  Your Honor --

THE COURT: Overruled, again, on the grounds that this is final argument.

MR. EDWARDS: I wouldn't want to put a value on our loss of her, but, again, I would just say that it was a complicated one and that while there was great suffering associated with it, there was also a sense of, okay, this drama aspect of things is no longer part of our lives.

So, again, I'm not going to tell you what that number is. I think $12 million is more than it ought to be, but you are ultimately the ones who are going to have to decide that and I am not going to presume to tell you. I wouldn't want to have to decide it, and I don't envy the task that you have to endure.

But you're also going to be asked here whether by a preponderance of the evidence Defendant Nathaniel Younce's conduct was malicious or recklessly indifferent. This is one I want to circle back to liability on, because you were asked whether Nathaniel Younce wrongfully caused Mr. Handy's death and the instruction that related to that talked about willful or malicious conduct.

And you concluded that it was a wrongful death, but I'm a little concerned that you may have given credence to an argument that counsel made in his closing argument on liability where he referred to the notion, well, maybe this was just negligence by these officers. Negligence is not

malicious or willful conduct. It doesn't reflect recklessness in the manner that this punitive damages instruction requires.

I would submit to you if you believe, if you believe that Nathaniel Younce looked at an unarmed man who had thrown his gun down and put his hands in the air and intentionally chose to shoot that person, punitive damages may be appropriate.

But unless you believe that -- under the facts of this case, I do not believe they are appropriate because you have to consider the wholistic situation that Officers Nathaniel Younce and Mikko Norman were confronted with that night. Again, it's undisputed that Mr. Handy had a gun, that he was high on bath salts, and you've seen the way he was behaving just moments before this incident happened.

So, again, if you believe this was an intentional execution of Mr. Handy, well, punitive damages may very well be appropriate, but I don't think the facts get you there by any means.

Counsel talked about the notion that Mr. Younce had -- or Officer Younce had confessed on the stand. That's not true. He was asked questions about his memory of certain events of that night. He said, Yeah, now that I think about it, my memory must have been wrong. Those were never about that key moment of remembering the gun pointed

at his friend and his partner, Mikko Norman.

I respect the jury's verdict on liability, but, again, I would submit that only if you believe this was an intentional killing is it appropriate to consider punitive damages in this case. And I don't believe the evidence gets you there. In light of that, we would respectfully ask that you check "no" on Box 2.

Now, if, and only if, you believe that Officer Younce's actions were willful -- excuse me, malicious or recklessly indifferent are you going to be asked to award an amount of punitive damages.

Again, I'd ask you to consider the entirety of the situation here. Counsel talked about a cover-up, well, sometimes the cover-up is worse than the actual offense. I don't think the evidence here showed a cover-up.

I think the evidence here showed on both sides, that is, Ms. Mollner, who -- testified she didn't see a gun in his hand at any time outside of the apartment building, which is really different from what Ms. Johnson-Blakney said. Their memories of this event were different.

And so to the extent that Officer Vang testified in a manner that was somewhat different from Officers Norman and Younce, I don't think that reflects some cover-up on anyone's part.

If you think it was, if you think that Officer

Younce intentionally killed this person and that these officers colluded in some manner to cover it up, then, okay, punitive damages may be appropriate.

As for an amount of them, well, you're going to be instructed by the Judge.  I'm going to show you the instruction here.  These are the factors that -- if you were to find that Officer Younce behaved maliciously or with reckless indifference to Mr. Handy, these are the factors you are to consider in evaluating your punitive damages:

"Number 1, How reprehensible the officer's conduct was."  I'm looking at the bottom here.  Let me move that up. "In this regard, you may consider whether there was intentional malice, reckless disregard for human health or safety; whether the officer's conduct also posed a risk of harm to others; whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed Mr. Handy.

"Number 2, how much harm the officer's wrongful conduct caused plaintiff and could cause the plaintiff in the future.

"3, what amount of punitive damages, in addition to the other damages already awarded, is needed, considering the officer's financial condition, to punish him for his wrongful conduct and to discourage the officer and others from similar wrongful conduct in the future.

"The amount of any punitive damages award should bear a reasonable relationship to the harm caused to plaintiff."

So how reprehensible the officer's conduct was? Again, there's a spectrum here. In his closing argument on liability, counsel talked about negligence being something that you might consider. Again, if it's negligence, then you don't even get to this because you've answered "no" to Question Number 2.

But you may consider whether there was intentional malice, reckless disregard for human health or safety; whether the officer's conduct also posed a risk of harm to others; whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed Mr. Handy.

So, again, if there was intentional malice because Officer Younce intentionally killed Mr. Handy, well, that would weigh in their favor as to that first component.

Also with reckless disregard for human health or safety, he either did this intentionally or he didn't. If he did, then those are factors that weigh in favor of the plaintiff. If he didn't intentionally shoot an unarmed man, then those weigh in favor of the defense.

"Whether the officer's conduct also posed a risk of harm to others." There's no evidence that it did.

"Whether there was any repetition of the wrongful

conduct and past conduct of the sort that harmed Mr. Handy." There's been no evidence of anything like that.  So those factors weigh in favor of the defense.

I'm going to skip Number 2, which is how much harm the wrongful conduct caused the plaintiff -- because here it's a lot; he died -- if you conclude that there was willful or malicious conduct.

"What amount of punitive damages, in addition to the other damages already awarded, is needed, considering the officer's financial condition, to punish him for his wrongful conduct and to discourage the officer and others from similar wrongful conduct in the future."

Again, I think that is going to be driven by what you think happened here.  If you think that this officer intentionally killed someone after they threw down a gun and surrendered, you may feel that significant punishment is necessary to deter him and to deter others.

If you effectively believe that when he got choked up on the stand describing seeing that gun pointed at his partner, that that was part of some cover-up, that he was cynically behaving that way to try to elicit sympathy because he had intentionally done something to Mr. Handy, well, you know, okay, fine, then maybe punitive damages are appropriate.

But, again, I don't think the evidence shows that

and I don't think the plaintiff has established a basis for punitive damages, much less significant punitive damages, in order to deter this type of conduct, whether by Officer Younce or by other officers in the future.

They haven't put in any evidence about a pattern of conduct, either within this department or on behalf of Officer Younce, to behave in a way that involved the use of excessive force and so you don't really have any track record to go on to establish that.

I would submit to you that the credible evidence in this case does not demonstrate the sort of malicious or reckless indifference that would be required to award punitive damages and so I don't believe that any are appropriate.

Ultimately, as I said, you have the difficult decision of deciding -- the difficult role of deciding what the damages should be in this case.  Again, all I would ask that you do is not to consider Mr. Handy a lunatic -- that was my poor choice of words -- but rather to consider the whole reality of who he was, the nature of his relationship to his family.

I think when you do that, the amount of compensatory damages is going to be considerably less than the $12 million that he's asked you for and you're going to find there isn't a basis for punitive damages.

I wish you luck in your deliberations, and I thank you for your patience.

THE COURT:  Do you want -- okay, go ahead.  I'm sorry.

MR. O'CONNOR:  Just briefly to reply.

Mr. Handy, unlike your sister, was gunned down in the street by police officers.  He didn't kill himself.  He didn't starve himself to death.  This is at the hands of the police.  And to make that analogy to this family is inappropriate.  It's inappropriate on so many levels.  To say you are sorry for their loss and then to make that analogy, to say you have the greatest respect for her and then to make that analogy is all part of the context of retrying -- trying to retry this case.

Compensation is not to punish on the compensatory damages, but on the punitive damages it is to punish and you can consider it.

When he says he spent half his life -- adult life in jail, I thought the evidence was three years.  He's 29.  Is that half?  Maybe your math is a little off.

He was gunned down in the street, gunned down, put down like a dog, apparently.

Malicious or reckless.  He says I have to prove it's intentional.  I don't have to prove it's intentional.  I have to prove he intentionally shot him.  There's no

question he intentionally shot him.  The question is when he shot him was he malicious or reckless, one or the other, and you have already decided that issue.

And somebody says -- behaves willfully when he knows or has reason to know and acts as prohibited by law and intentionally does it anyway.

You act maliciously when you intentionally injure another without just cause, and I suggest that's what you found on your liability section.  He wants to try this case over again on the part you have already found.  You've already found that aspect.  You've already found that he acted maliciously related to injuring another without just cause.  That's what this case is about.  That's what I've argued to you.  That's what your finding reflects.

When he says that you should check that box, that box has already been checked and you need to recheck it that says, yes, he did it maliciously, he did it without just cause, he intentionally shot him.  We all know that.  He didn't intentionally want to shoot an unarmed man, but he did it maliciously because he did it without just cause; and that's what this case is about.

When they talk about I have all due respect, I really feel for this, no, you don't.  No, you don't.  Not in those comments you don't and not saying that I'm going to -- we're going to just let this slide.  Hey, if they gunned him

down in the street -- I've got news for you.  If they gunned him down in the street and said they intentionally did it, I'd be asking for $100 million because there would be no amount of money if you executed somebody.

But when you act maliciously, when you act without just cause, and you do it wrongfully with a badge and a gun, I ask that you need to deter that conduct.  You need to deter that future conduct and that punitive damages are appropriate.

The last thing I'm going to say related to this -- I lost my last note.  I can't even find it.

*(Pause in proceedings)*

MR. O'CONNOR:  Here.  When you go home, you as a jury need to go home, you may be asked what you did in court today, and you can look them straight in the eye and say we helped make St. Paul safer for everybody to live without fear of the police; we showed a family that their son had a value, he had a name, he was a human being; and we rendered full and complete justice, not the half justice that the defendants propose.

Out of due respect?  You didn't even recommend a number to this family to compensate them for their loss. That's not due respect.  That's a lack of respect, which is the same lack of respect he got that night.

Thank you.

THE COURT:  Members of the Jury, let me repeat something.  All of the instructions I have given you throughout the trial, including the instructions I recently gave to you regarding liability, continue to apply.

You may refer to written instructions previously provided to you in assessing damages in this case.  Some of those definitions, for example, are in the other instructions.

You have determined that Officer Younce used excessive force and wrongfully caused Mr. Handy's death.  As a result, you must consider monetary damages for the family members represented by plaintiff as the trustee for Mr. Handy's next of kin.  That means you will determine an amount of money that will fairly and adequately compensate Mr. Handy's next of kin for the loss that they suffered as a result of his death.  In doing so, you should consider what Mr. Handy would have provided to his next of kin if he had lived.  Consider the following factors in making that determination:

Number 1, his past financial contributions to the family.

Number 2, his life expectancy at the time of his death.

Number 3, his health, age, habits, talents, and successes.

Number 4, all reasonable expenses incurred for his funeral and burial.

Number 5, the counsel, guidance, and aid he would have given his family.

And number 6, the advice, comfort, assistance, companionship, and protection that he would have provided for his family if he had lived.

Decide the length of time family members might be expected to survive together.  You should compare his life expectancy -- I'm sorry, the life expectancy of Mr. Handy with the life expectancy of each family member.  Consider only the amount of time Mr. Handy and each family member would have shared together.  Base any money damages for each family member on the shorter of each life expectancy.

Do not include monetary damages relating to the following:

Number 1, punishment for the defendants.

Number 2, grief or emotional distress of the family.

Or 3, the pain and suffering of Mr. Handy before his death.

You must determine the total amount of money that will fairly and adequately compensate Mr. Handy's family for the damages suffered as a result of his death.  The Court will divide the damages among the next of kin as

appropriate.

If you find that plaintiff has failed to -- if you find that plaintiff has failed to establish that any damages related to her constitutional claim have monetary value, then you must return a verdict for the plaintiff in the nominal amount of $1.

The following is a mortality table that can be used by you as evidence of the average life expectancy of a person who has attained a certain age.  This number is not conclusive, but it can be used by you as evidence, along with the other evidence in this case, to determine Mr. Handy and certain of his family members' life expectancies.

You have received evidence in the form of the mortality table identified as Plaintiff's Exhibit Number 81 about the life expectancy of Mr. Handy and his next of kin from the time of the shooting and thereafter.

The life expectancy of any individual person depends more on the circumstances of his or her own life than it does on the expectancy of the lives of others.

The life expectancy evidence you have heard, both the documentary tables and witnesses' testimony, are not to be accepted by you as establishing the life expectancy of anyone, including Mr. Handy and his next of kin.

Such evidence has been received in evidence only to aid you, the jury, in your decision of what Mr. Handy and

his next of kin's life expectancy might reasonably be expected to be in view of all the circumstances of his or her life only for the purpose of your determining damages in this case.  In this regard, you must consider all the evidence received by the Court and all the instructions the Court has given you and will give you in this case.

According to the mortality table in the evidence:

Number 1, the average life expectancy of black males between 18 and 19 is 51.1 years.

Second, the average life expectancy of black males between 29 and 30 is 41.6 years.

Third, the average life expectancy of black males between 41 and 42 is 31.5 years.

Number 4, the average life expectancy of black males between 23 and 24 is 46.7 years.

6 [sic], average life expectancy of black females between 29 and 30 is 48 years.

And the average life expectancy of black females between 58 and 59 is 22.8 years.

In addition to the damages mentioned in other instructions, the law permits the jury under certain circumstances to award punitive damages.

If you find in favor of plaintiff and if it has been proved that the conduct of Officer Younce's was done maliciously or with reckless indifference to Mr. Handy, then

you may, but are not required to, award plaintiff an additional amount of money as punitive damages for the purpose of punishing defendants for engaging in misconduct and discouraging the defendants and others from engaging in similar misconduct in the future.

You should presume that plaintiff has been made whole for her injuries and those of Mr. Handy's other family members by the damages as set forth in Instruction Number 2.

If you decide to award punitive damages, you should consider the following in deciding the amount of punitive damages to award:

Number 1, how reprehensible the officer's conduct was. In this regard, you may consider whether there was an intentional malice, reckless disregard for human health or safety; whether the officer's conduct also posed a risk of harm to others; and if there's any repetition of the wrongful conduct and past conduct of the sort that harmed Mr. Handy.

Number 2, how much harm the officer's wrongful conduct caused plaintiff and could cause the plaintiff in the future.

Number 3, what amount of punitive damages, in addition to the other damages already awarded, is needed, considering the officer's financial condition, to punish him for his wrongful conduct and to discourage the officer and

others from similar wrongful conduct in the future.

The amount of any punitive damages award should bear a reasonable relationship to the harm caused to plaintiff.

Now, in returning to the jury room, again, the foreperson, your foreperson, who you have already elected, will preside over your deliberations and will be your spokesperson here in court.

A verdict form regarding damages has been prepared for your convenience, and you've already seen that. Counsel have correctly referred to it. But it says, "Verdict Form - Damages" on it. It will be provided to you in the deliberation room, and it's very simple. There are four questions -- three questions.

We, the jury, return the following unanimous verdict:

Number 1. What sum of money will fairly and adequately compensate Mr. Handy's next of kin for their injuries, damages, and harm?

You notice all the next of kin have been lumped, and that's been explained in the instructions as to what happens.

Number 2. Do you find by a preponderance of the evidence that Defendant Nathaniel Younce's conduct was malicious or recklessly indifferent as it relates to this

part of the case?

If you answer "no" to Question Number 2, your deliberations are complete and you should have your foreperson sign and date the form.

If you answer "yes" to Question Number 2, please continue to Question 3.

That Question Number 3 is:  If you determine that Defendant Nathaniel Younce's conduct was malicious or recklessly indifferent, what, if any, amount of punitive damages is awarded?  A blank to fill in.

A place to date it and a signature line for the foreperson.

As I instructed you before, if it becomes necessary during your deliberations to communicate with me, you may send a note by the bailiff signed by your foreperson or one or more members of the jury.

No member of the jury should ever attempt to communicate with me by any means other than a signed writing.  I will never communicate with any member of the jury on any subject touching the merits of this case otherwise than in writing or orally here in open court.

Please keep in mind that the bailiffs and other persons are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you never are to reveal to any person, not even to me, how the jury stands numerically or otherwise on the questions before you until after you have reached a unanimous verdict.

Counsel, may I see you up here, please?

*(At sidebar)*

THE COURT:  Any objections to these instructions will be continued.  You don't have to remake them now.  Any other objections?

MR. EDWARDS:  No, Your Honor.

THE COURT:  Anything else that you want to have -- talk about before we send the jury out?

MR. O'CONNOR:  No.

MR. EDWARDS:  No, Your Honor.

THE COURT:  Okay.

*(In open court)*

THE COURT:  Mr. Bailiff, will you come over and take the jury to the jury room to begin deliberations on this part of it.  I can't remember if I swore you in before.  Were you the bailiff I swore in?

COURT SECURITY OFFICER:  No, sir.

THE COURT:  Let's swear you in one more time.  Please raise your right hand.

*(Court security officer sworn)*

THE COURT:  Thank you.  Please take the jury and

escort them to the jury room.

All stand, please.

*(Jury excused)*

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT:  Do you want to take your seats.

Again, your guess is as good as mine as to how long it is going to take them to complete their work on this aspect of it, but.  So do the same thing that I asked you to do last time, let us know where you are, where we can reach you and get you back here to either answer questions or to receive a verdict.

Let's hope this time we have a verdict within an hour or so and -- because I think that should -- it shouldn't take them that long.  They are used to working with each other.  Who knows, however.  Juries do what juries do.

So we'll see you back here when we know something more.

(Recess taken at 10:16 a.m.)

*         *         *         *         *

(1:09 p.m.)

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT:  As I am sure you have been told, we

have a verdict.  They are being brought in.

*(Pause in proceedings)*

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT:  Do you want to take your seats, please.

Members of the Jury, I understand you have reached a verdict.  If you would, would you hand it up to the bailiff, please, who will hand it up to me.

*(Document handed to the Court)*

THE COURT:  Thank you.

Well, you filled out the forms and it's on the form and -- the verdict form for damages.

We, the jury, return the following unanimous verdict:

Number 1.  What sum of money will fairly and adequately compensate Mr. Handy's next of kin for their injuries, damages, and harm?  $10 million.

Number 2.  Do you find by a preponderance of the evidence that Defendant Nathaniel Younce's conduct was malicious or recklessly indifferent?  The answer "yes" is checked.

If you answered "no" to -- just skip that, because if you answered "yes," please continue to Question Number 3.

Number 3.  If you determine that Defendant

Nathaniel Younce's conduct was malicious or recklessly indifferent, what, if any, amount of punitive damages is awarded?  $1.5 million.

It's signed -- dated August 1st and signed by the court person -- by the foreperson.  Your signature is as bad as mine.  I can't quite read it, but I will try to figure it out.

(Pause in proceedings)

THE COURT:  Tell me your name.

FOREPERSON:  Greg Glime.

THE COURT:  You'll have to say it louder.  I'm sorry.

FOREPERSON:  Greg Glime.

THE COURT:  Is it Blake?

MR. O'CONNOR:  Greg Glime.

THE COURT:  Gee whiz.

(Laughter)

THE COURT:  I'm sorry.  Okay.  I've got it.  Thank you.

Mr. Glime, I understand, because you signed this, that this is your verdict, true and correct, right?

FOREPERSON:  Yes, Your Honor.

THE COURT:  I am going to poll the jury.  I'm just going to ask the same question of all of you.

Mr. Alam, verdict true and correct?

JUROR ALAM:  (Nodding.)

THE COURT:  Just say "yes" out loud.

JUROR ALAM:  Yes.

THE COURT:  Okay.  Thank you.

Mr. Berge, your verdict true and correct?

JUROR BERGE:  Yes.

THE COURT:  Ms. Blonigen, your verdict true and correct?

JUROR BLONIGEN:  Yes.

THE COURT:  Ms. Duncan, your verdict true and correct?

JUROR DUNCAN:  Yes.

THE COURT:  Ms. Freedlund, your verdict true and correct?

JUROR FREEDLUND:  Yes.

THE COURT:  Ms. Johnson, your verdict true and correct?

JUROR JOHNSON:  Yes.

THE COURT:  Mr. Martin, your verdict true and correct?

JUROR MARTIN:  Yes.

THE COURT:  Mr. Midstokke, your verdict true and correct?

JUROR MIDSTOKKE:  Yes.

THE COURT:  Mr. Rasmussen, your verdict true and

correct?

JUROR RASMUSSEN:  Yes.

THE COURT:  Mr. Strusz, your verdict true and correct?

JUROR STRUSZ:  Yes.

THE COURT:  And Ms. Yates, your verdict true and correct?

JUROR YATES:  Yes.

THE COURT:  Members of the Jury, you have now completed your work and I am going to discharge you as a jury, which means you are no longer a jury.  You are just a group of 12 people.  So you can now talk to people.  You can talk about what you've done.  You can do anything else you would like at this point.  Let me just tell you a couple things, a couple hints.

You have a right of free speech, so you can talk.  That's why we tell you that.  Part of the right of free speech, however, that is never talked about very much, but it is in this situation, and that is you do not have to talk to anybody.

If somebody calls you and said, "I want to talk to you about it," you can say, "I'm sorry, I don't want to" and let it go at that and insist on that because the judge said you could, if nothing else.  You can always blame me.

So -- and there's one exception, and that is if

the lawyers want to talk to you, they have to go through a series of requests. They have to request of the Court that they be allowed to contact the jurors. Usually we allow that because they will be -- and they are warned that they have to be rational and ethical and so forth. And so we'll allow the lawyers to sometimes check with you. So if you get a call from one of the lawyers, that's probably been approved by the judge; should have been at least.

There's another thing I'm sure that some of you are thinking about, and that is you hear all these stories, and if you read novels about this, all kinds of things happen to jurors after they have reached a verdict in a case.

This case has had a lot of notoriety and a lot of emotion involved. Let me tell you something. If anything happens in your life that you believe is caused by your jury duty, and I don't mean being fined by your boss or something or anything like that -- you know what I am talking about -- if something happens that you seem to think you're being harassed because of your jury service, you call me. I used to say my name is in the phone book. I'm not even sure there's a phone book anymore. But it's online. You can look us up and find my number and call me, because we have assets that we can employ that will help you in your situation. Your imagination can probably take you to what

those assets might be, but we have people and other things that we can use to make sure that you are protected.

Now, I have given this little talk to every jury that has been before me, hundreds. I have had zero calls. Why? Because it just doesn't happen, apparently.

Now, I'm also speaking to the folks in the back, that they're hearing me. I know they are. And I know they will take that to heart also, that they won't do it, because it would be improper for them to do that. So that's why I give this little talk.

Now, also in front of me I have some beautiful engraved certificates of appreciation, which I would like to hand out to you, but I would rather do this in the jury room. So if you don't mind hanging around for another few minutes, I would like to have you go back to the jury room. I will give you your certificates of appreciation and answer any questions that I can that you might still have.

But would you do that, please, and follow the bailiff to your jury room.

All rise. I am going to order that the verdict form be filed.

*(Jury excused)*

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: Close the door, please. Thank you.

Take your seats, please.

Counsel, is there anything you need to talk to the judge about before we break up?

MR. O'CONNOR:  No, Your Honor.

MR. EDWARDS:  I don't think so, Your Honor, other than that I'm aware that the Court needs to apportion the damages as between the members of the --

THE COURT:  Right.  I think I would request that you both give me an idea of how that ought to happen, especially the plaintiff's attorney.  You know, we know something about these folks, but not as much as you do, and I would appreciate any help from them.  And likewise from defendants' attorney.  Share the information with the defendant.  And so that when it comes to back to us, we'll have some information as to how to go about apportioning that.  Okay?  Does that make sense?

MR. EDWARDS:  Yes, Your Honor.

THE COURT:  Okay.  Anything else?

MR. O'CONNOR:  No, Your Honor.  Thank you.

MR. EDWARDS:  No, Your Honor.

THE COURT:  Thank you.  Take care.

Court is going to stand in recess.

(Court adjourned at 1:18 p.m.)

                        *        *        *

I, Lori A. Simpson, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by:  *s/ Lori A. Simpson*

Lori A. Simpson, RMR-CRR