## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kim Diane Handy Jones, as Trustee for the next of kin of Cordale Quinn Handy, | Civil File No. 20-CV-707 (DSD/ECW) |
| Plaintiff, | |
| vs. | **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF COSTS AND PREJUDGMENT INTEREST** |
| City of St. Paul, Minnesota; St. Paul Police Officer Mikko Norman, in his individual and official capacities; St. Paul Police Officer Nathaniel Younce, in his individual and official capacities, | |
| Defendants. | |

## INTRODUCTION

Following the Court's ruling on a defense motion for partial summary judgment (on which the Court awarded all relief sought, including dismissal of several of Plaintiff's causes of action, and two individuals as named Defendants), Plaintiff Kim Diane Handy Jones prevailed in part at trial, receiving a sizable judgment against one Defendant, Officer Nathaniel Younce[1].   As a prevailing party in a Section 1983 action, this outcome entitles Plaintiff to petition the Court for her fees and costs under 42 U.S.C. § 1988.  Unfortunately, Plaintiff's counsel have not limited themselves to seeking amounts which are reasonable

---

[1]   Defendants respectfully believe the jury's verdict was inconsistent, and that the amount awarded was plainly excessive.  These, among other matters, will be addressed more fully in Defendants' Rule 59 motions, which will be timely filed within 28 days following entry of judgment, pursuant to Rule 59 of the Federal Rules of Civil Procedure and applicable local rules.

and/or properly awarded to a prevailing party under Section 1988.  Instead, counsel seeks more than $6,000,000 in additional fees and costs, the vast majority of which are unsupported by law and fact.

First, Plaintiff seeks $3,191,308 in prejudgment interest.  Prejudgment interest is available only in situations in which the amount of damages awarded is liquidated or otherwise computable when the interest begins to toll.  Here, the jury could, consistent with applicable law, have awarded as little as $1, and of the $10,000,000 in compensatory damages awarded, only decedent Cordale Handy's funeral expenses (totaling $15,259.56 – *see* Trial Ex. P-50) could have been computed prior to the jury's damages verdict.  Accordingly, should the Court award any pretrial interest, it must be calculated on the liquidated damages amount ($15,259.56), for the period from the inception of this litigation to the date of the jury's damages award.

Second, Plaintiff seeks a remarkable $3,493,675.00 in attorney's fees.  This eye-watering sum reflects the view of Plaintiff's counsel that the traditional lodestar amount (that is, a reasonable hourly rate times the number of hours reasonably expended in prosecution of the case) is inadequate, and that a 2.5x multiplier of the lodestar amount should apply.  Plaintiff provides no compelling justification for this multiplier, and a review of the materials submitted in support of Plaintiff's attorneys' fees petition reveals that it is sorely lacking in multiple important respects.  Plaintiff's counsel have provided *no* support for the reasonableness of the top-of-market hourly rates sought, whether in the form of supporting affidavits from other attorneys or even any claim that Plaintiff's counsel have ever billed a client at these rates, or been awarded these rates by other courts.  The billing

2

records of counsel are truly remarkable in both their vagueness (counsel seeks, for example, *300 hours* of attorney time for Attorney Bosman for the year 2019 – months before this case was put into suit – based solely on a one-line description of services rendered which reflects that the work performed was not reasonably tied to this case), their inclusion of wholly unrelated and/or unreasonable work, and the quantity of hours purportedly spent by counsel.  It is clear, in aggregate, that not only is a multiplication of the lodestar amount unwarranted, but that a substantial percentage of the lodestar amount sought (itself a wildly excessive $1,397,470.00) is not properly taxable as costs.

Lastly, even the simplest part of a submission of this nature – litigation costs – has been bungled.  Plaintiff's counsel seeks tens of thousands of dollars in costs, a large percentage of which relate to impermissible costs, such as expert fees, attorney travel and meals, mail and delivery charges, and costs related to depositions which are not available under applicable rules.

In aggregate, Plaintiff's petition for fees and costs is fundamentally flawed.  The Court should deny any award of prejudgment interest, deny any multiplication of the lodestar amount of attorneys' fees, greatly reduce the hourly attorneys' fees from the amounts sought, and narrow the litigation costs awarded to those permitted under applicable rules.

**ARGUMENT**

## I.   PLAINTIFF'S REQUEST FOR PREJUDGMENT INTEREST SHOULD BE REJECTED AS CONTRARY TO APPLICABLE LAW.

"Generally, prejudgment interest is awarded when the amount is reasonably ascertainable and to make the claimant whole because he or she has been denied the use of the money." *Winter v. Cerro Gordo Cnty. Conservation Bd.*, 925 F.2d 1069, 1073 (8th Cir. 1991), citing *Stroh Container Co. v. Delphi Indus., Inc.,* 783 F.2d 743, 752 (8th Cir.), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986). "Prejudgment interest serves at least two purposes: (1) it helps compensate plaintiffs for the true cost of money damages they have incurred, (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an attempt to benefit unfairly from the inherent delays of litigation." *E.E.O.C. v. Rath Packing Co.,* 787 F.2d 318, 333 (8th Cir. 1986) (citation omitted).   "The decision whether to award prejudgment interest is within the district court's discretion and we will reverse that decision only for abuse of discretion." *Smith v. World Ins. Co.*, 38 F.3d 1456, 1467 (8th Cir. 1994)

Generally, "[f]ederal law governs the award of postjudgment interest . . . while state law governs the award of prejudgment interest." *Weitz Co., Inc. v. Mo-Kan Carpet, Inc.,* 723 F.2d 1382, 1385 (8th Cir. 1983); *see also ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*, 59 F.4th 905, 922–23 (8th Cir. 2023).

In Minnesota, both statute and common law govern the award of prejudgment interest.  Minn. Stat. § 549.09 (1996); *Potter v. Hartzell Propeller, Inc.,* 291 Minn. 513, 518, 189 N.W.2d 499, 504 (1971).  Issues underlying the application of the statute,

including whether a claim is liquidated, readily ascertainable, or unliquidated, are questions of fact to be decided by the district court. *See Spinett, Inc. v. Peoples Natural Gas Co.,* 385 N.W.2d 834, 841 (Minn. Ct. App. 1986).

Prior to 1984, prejudgment interest was available only on liquidated claims and on unliquidated claims if the amount was readily ascertainable. *Casey v. State Farm Mut. Auto. Ins. Co.,* 464 N.W.2d 736, 739 (Minn. Ct. App. 1991), *review denied* (Minn. Apr. 5, 1991). In 1984, the legislature extended the availability of prejudgment interest to provide that prejudgment interest on pecuniary damages, except as otherwise provided by contract or allowed by law, shall be computed from the time of the commencement of the action. Minn.Stat. § 549.09, subd. 1(b) (1996).

By making an exception for prejudgment interest "allowed by law," the legislature supplemented, but did not replace, the existing common law allowing prejudgment interest. *Seaway Port Auth. v. Midland Ins. Co.,* 430 N.W.2d 242, 252 (Minn.App.1988); *see also Spinett,* 385 N.W.2d at 840. "The exception is significant because, at common law, prejudgment interest begins to run on a liquidated and on a readily ascertainable unliquidated claim when it arises." *Trapp v. Hancuh*, 587 N.W.2d 61, 63–64 (Minn. Ct. App. 1998), citing *ICC Leasing Corp. v. Midwestern Mach. Co.,* 257 N.W.2d 551, 556 (Minn.1977).

Prejudgment interest from the time the claim arises is appropriate when the amount demanded can be ascertained by computation or reference to generally recognized standards and does not depend on a contingency. *Jostens, Inc. v. CNA Ins., Continental Cas. Co.,* 336 N.W.2d 544, 546 (Minn. 1983); *see also Clements Auto Co. v. Serv. Bureau*

*Corp.,* 444 F.2d 169, 189 (8th Cir. 1971) (citations omitted) ("It is . . . the rule in Minnesota that pre-judgment interest is not allowed on unliquidated claims that are not readily ascertainable by computation or by reference to generally recognized standards, or where the amount of the claim is dependent in whole or in part upon the discretion of the jury.")

In the case of *Miller v. Bd. of Regents of Univ. of Minnesota*, 402 F. Supp. 3d 568 (D. Minn. 2019), plaintiff Shannon Miller, former head coach of the University of Minnesota women's hockey team, sued the University after her contract was not renewed, arguing, among other things, that she was discriminated against on the basis of her gender under Title VII of the Civil Rights Act of 1964, and a victim of retaliation under Title IX of the Education Amendments of 1972. *Id.* at 575. Ultimately, a jury found in her favor on these claims (other claims had been dismissed on a motion for summary judgment by the defendants). *Id.* The jury awarded $744,832 in back pay and benefits, and $3,000,000 in other past damages. *Id.*

Following her win at trial, Miller sought prejudgment interest as to the full amount of the judgment. *Id.* at 589-90. The Court concluded that it would be appropriate to award prejudgment interest on the back pay (a liquidated, easily-calculated amount which was not disputed), but not on the other damages awarded:

> With respect to Miller's past non-economic damages, however, the Court finds that prejudgment interest is not warranted. The amount of such damages is not merely uncertain; it is totally unpredictable, as this case well illustrates. . . . Under these circumstances, it is unnecessary to award prejudgment interest, and it would be inequitable to do so on an amount that remains hotly contested and that was not reasonably ascertainable.

*Id.*

6

Here, literally not a penny of the damages awarded by the jury, with the possible exception of funeral expenses (these total $15,259.56 – *see* Trial Exhibit P-50), was amenable to computation until the moment that the jury issued its damages award. *Jostens, Inc.* 336 N.W.2d at 546.   The enormous damages award here was issued following arguments by Plaintiff's counsel that the most consequential part of the damages sought related to the loss of decedent Cordale Handy's companionship and counsel, not to his financial contributions to his family (the latter being something which was, at least potentially, amenable to being reduced to a liquidated amount, as opposed to the value of Handy's companionship and counsel, which clearly is not).   The Plaintiff could have presented evidence regarding the amount of wages earned by decedent Cordale Handy, and/or evidence of the financial impact of those wages on his next of kin, as a means of establishing the liquidated damages flowing from his death (similar to the back pay on which prejudgment interest was awarded in *Miller*).   She elected not to do so.   By failing to do so, she denied the Court any opportunity to establish whether any portion of the damages sought, and ultimately awarded by the jury, other than funeral costs, were subject to computation in a manner which could have led to an award of prejudgment interest under Minnesota law.

In the absence of any presentation of evidence purporting to quantify the Handy family's damages, the amount of the damages here was, like the non-economic damages in *Miller*, "not merely uncertain . . . [but] totally unpredictable."  *Miller*, 402 F. Supp. 3d 589-90.  The jury could, in this case, consistent with the instructions provided by the Court and applicable law governing Section 1983 litigation, have found liability but awarded $1 in

nominal damages.  It could, alternatively, have awarded merely the decedent's funeral expenses, or some other amount between that and the damages actually awarded, whether that amount be $50,000, $1,000,000, or some other sum.  The amount was not remotely knowable to the Defendants or amenable to computation, and liability was reasonably disputed by the parties.  The Court cannot reasonably order Defendants to pay the astronomical amount sought in prejudgment interest, presumably as punishment for failing to know something which was inherently unknowable:  the amount a jury would award if it found one or more Defendant liable.  Public policy would not be served by ordering the Defendants, already having been ordered to pay $11,500,000 in damages, to pay millions of dollars more in public funds for reasonably having declined to settle this case years ago, much less for failing to settle it for an eight-figure sum of the sort awarded by the jury herein.

In addition to the foregoing arguments, Minnesota law is clear, as Plaintiff concedes, that prejudgment interest may not be awarded based on future damages.  *See* Plaintiff's Memorandum of Law ("Plaintiff's Memo."), p. 4; *see also Johnson v. Wash. Cty.,* 506 N.W.2d 632, 640 (Minn. Ct. App. 1993).  Plaintiff states, without authority or supporting evidence, that she "believes that the majority of loss occurs at or near the time of the wrongful death, and that pre-verdict interest should be calculated on 50% of the compensatory damages award."  Plaintiff's Memo., p. 4.  This unsupported allegation reinforces the very reason no prejudgment interest should be awarded:  because the amount of damages was simply unknowable and unpredictable by the Parties.

To the extent the Court elects to award any prejudgment interest on amounts other than funeral expenses (which it should not), any such award should be based on the actuarial tables submitted to the jury at Plaintiff's request, which reflect that Cordale Handy would, but for this incident, have lived and maintained a relationship with his family for decades, meaning that the 6 years since his death represent the distinct minority of the total damages award, with the great majority representing future damages. Such a disposition would be consistent with the fact that, under Minnesota law, damages for wrongful death are limited to the pecuniary loss suffered by survivors, and not their emotional distress. *See* the Court's damages Jury Instruction No. 2 (instructing jurors to "[c]onsider only the amount of time Mr. Handy and each family member would have shared together," and not to award damages relating to the "[g]rief or emotional distress of the family").

Lastly, to the extent that the Court elects to award prejudgment interest for any portion of the jury's award (as stated above, the funeral expenses are arguably awardable), the prejudgment interest on any such award should begin with the inception of the present litigation, rather than some earlier date. Plaintiff initially filed suit against the City for the death of her son within a few weeks of his death, in April 2017, then voluntarily dismissed the case without prejudice in March 2019. *See Handy Jones v. City of Saint Paul et al*, Case No. 17-CV-1145 (D. Minn. Mar. 4, 2019). Given that Plaintiff voluntarily abandoned her first action, it would be unjust and contrary to public policy to require that the Defendants pay prejudgment interest dating back to the date of decedent's death, or the date of the inception of Plaintiff's first action, which she voluntarily dismissed.

## II.   PLAINTIFF'S MOTION FOR ATTORNEYS' FEES IS EXCESSIVE, UNSUPPORTED BY ADEQUATE DOCUMENTATION, AND SHOULD BE DENIED OR, AT MOST, GRANTED IN PART BASED ON THE SCANT DOCUMENTATION PROVIDED.

42 U.S.C. § 1988 provides, in part, "[i]n any action or proceeding to enforce a provision of section[s]…1983…the court, in its discretion, *may* allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs…". (emphasis added.)  A Court is not required to grant a prevailing plaintiff's motion for attorney fees and costs under Section 1988.  *Id.*

An award of attorney fees to a prevailing party must be "reasonable."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  A reasonable fee is "one that is 'adequate to attract competent counsel, but . . . [that does] not produce windfalls to attorneys.'" *Blum v. Stenson,* 465 U.S. 886, 897 (1984) (quoting S.Rep. No. 94–1011, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S. Code Cong. & Admin. News 5908, 5913).

The starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley,* 461 U.S. at 433.  The district court should exclude from this initial fee the calculation of hours that were not "reasonably expended." *Hensley*, 461 U.S. at 434. "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id*. "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Id*.

10

The fee applicant bears the burden of establishing entitlement to an award and documenting: (1) the appropriate hours expended, and (2) the hourly rates. *Id*. at 437; *Fish v. St. Cloud State University*, 295 F.3d 849, 851 (8th Cir. 2002). As to the hours expended, the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation. *United Slate, Tile & Composition Roofers v. G & M Roofing & Sheet Metal Co.,* 732 F.2d 495, 502 n. 2 (6th Cir. 1984). As to the hourly rates applied, "[t]he party seeking attorney's fees bears the burden of producing 'satisfactory evidence that the requested rate is in line with prevailing market rates.'" *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (quoting *Norman v. Housing Auth.,* 836 F.2d 1292, 1302 (11th Cir. 1988)).

## A.    Plaintiffs Have Not Provided Any Justification for the Hourly Rates Sought.

Awards of attorneys' fees should be calculated using "market rates," and the "requested rates [should be] in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *McDonald v. Armontrout*, 860 F.2d 1456, 1458-59 (8th Cir. 1988) (citing *Blum v. Stenson*, 465 U.S. at 896 n. 11). A reasonable fee is "one that is 'adequate to attract competent counsel, but . . . [that does] not produce windfalls to attorneys.'" *McDonald*, 860 F.2d at 1457 (citing *Blum*, 465 U.S. 886, 897). "A reasonable hourly rate is usually the ordinary rate for similar work in the community where the case has been litigated." *Emery v. Hunt*,

272 F.3d 1042, 1048 (8th Cir. 2001) (citing *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140 (8th Cir. 1982) (en banc)).

In *Blum,* the Supreme Court stated that to aid the court in determining the appropriate market rate for the services of an attorney, "the burden is on the fee applicant to produce satisfactory evidence—*in addition to the attorney's own affidavits*—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum,* 465 U.S. at 896 n. 11 (emphasis added); *see also Spegon v. Cath. Bishop of Chicago,* 175 F.3d 544, 556 (7th Cir. 1999) (citation omitted) ("An attorney's self-serving affidavit alone cannot satisfy the plaintiff's burden of establishing the market rate for that attorney's services.")

In establishing the reasonableness of a requested hourly rate, it is customary for the petitioning party to submit affidavits from other local attorneys opining that the requested rate is reasonable. *Loranger*, 10 F.3d at 781*; see also Rosen v. Wentworth,* 13 F. Supp. 3d 944, 951 (D. Minn. 2014) (requested hourly rate was supported by "three affidavits from local attorneys confirming the reasonableness of [the requested] hourly rate").  The petitioning party may also substantiate the reasonableness of the hourly rate sought through reference to other matters in which courts have approved as reasonable that same rate for the same counsel for whom the rate is sought in the case at bar.  *See, e.g., Bryant v. Jeffrey Sand Co.,* 919 F.3d 520, 529 (8th Cir. 2019) (noting, in approval of district court fee award, that the petitioning counsel had "supported [the requested hourly rate] by providing a list of recent fee awards he had obtained, including one from only a few months prior in which the same district court had concluded his $350 rate was reasonable").  The party seeking

fees may, further, provide affidavits stating that the rates requested are consistent with the hourly rates normally billed by the attorneys for whom fees are requested. *Animal Legal Def. Fund v. Reynolds,* 385 F. Supp. 3d 840, 844 (S.D. Iowa 2019) (emphasis added) ("counsel have provided the Court with affidavits regarding each attorney's qualifications, their contributions to this case, *the hourly rates they normally charge*, and—where applicable—the reduced rates they are seeking here").

This Court has previously held that a petitioning party that merely submitted an affidavit from its own counsel stating that counsel's rates were reasonable had failed to meet its burden of substantiating the reasonableness of the hourly rate requested. *Midwest Disability Initiative v. Nelmatt, LLC,* 344 F. Supp. 3d 1047, 1051 (D. Minn. 2018) (noting, in reducing the requested hourly rate in a case brought under the Americans with Disabilities Act, that the petitioning plaintiff "submits only a declaration from [plaintiff's counsel] himself, who opines that his hourly rate is reasonable").

Here, Plaintiff's counsel seek what are undeniably top-of-market rates for their services. If the rates requested were in fact reasonable, counsel could have provided sworn affidavits from other local attorneys saying so, commended to the Court other cases in which such rates were approved for their attorneys, and/or sworn that these rates are consistent with those they actually charge clients. They have done none of these things.

Remarkably, Plaintiff's counsel has not submitted a single affidavit or declaration from any other attorney opining that their claimed rates are reasonable and/or consistent with local norms. They have not submitted a single case in which a court – any court – has approved the requested rates, nor any other hourly rate, for the lawyers in this case. Even

the Affidavits of counsel contain no claim that their hourly rates are reasonable. *See* Affidavits of Kevin O'Connor, Paul Bosman and Nathaniel Cobbett.   Each contains some scant facts about each attorney's credentials, but nothing confirming that the rates sought are reasonable, that the rates are consistent with what they typically bill clients, and/or that the rates have been approved of by other courts. *Id.*   This is wholly insufficient. *Spegon,* 175 F.3d at 556; *see also Midwest Disability Initiative*, 344 F. Supp. 3d at 1051 and *Swart v. Scott County*, 650 F.Supp. 888, 895 (D. Minn. 1987) (Plaintiffs bear the burden of proving that their fee request is warranted).   The lack of any such information leaves the Court flying blind, and left to determine, without any clear basis for doing so, what rates might be appropriate.

The lone data point which Plaintiff's counsel has provided regarding the propriety of their rates is a state-court decision in a completely unrelated matter, involving what appears to be a business dispute in which the prevailing party was represented by Gibson, Dunn & Crutcher, LLP, a major international law firm with more than 1,000 attorneys and 20 offices.   The fact that a state-court judge awarded outsized fees to a major law firm in litigating a presumably complex business case has no bearing herein, nor does it provide any support whatsoever for the high rates sought.

The Plaintiff's failure to provide this critical information must be factored in when determining what rate might be justified.   Here, counsel have represented themselves as subject matter experts on civil rights litigation, yet have failed to meet even the rudiments of a petition for attorneys' fees.   This suggests that they are not the experts they purport to be, and should undermine the Court's confidence in their requested rates.

As to Mr. O'Connor, Plaintiff requests an hourly rate of $750.  It is conceivable such a rate *might* be justifiable, but Plaintiff has provided literally no information on which the Court could reach such a conclusion.  In the absence of any such information, on an issue on which the Plaintiff bears the burden of establishing a reasonable hourly rate, Mr. O'Connor's hourly rate should be reduced to, at most, $450 per hour. This District has approved $450 per hour for another civil rights attorney with comparable experience. *See Yanish v. Wegner*, No. 16-3030 (RHK/KMM) Doc. 33 at *7 (slip op.) (approving $450 per hour for civil rights litigator with more than 25 years of experience); *Rosen v. Wentworth*, 13 F. Supp. 3d 944, 951 (D. Minn. 2014).

As to Mr. Bosman, Plaintiff requests $550 per hour.  This rate is far in excess of what a similarly-qualified attorney would ordinarily bill or be compensated for in our legal market.  While Defendants do not dispute that Mr. Bosman was first licensed in 2008, he focused the initial years of his practice on bankruptcy.  Mr. Bosman's current civil rights practice began upon the reinstatement of his license in 2017, following a disciplinary suspension.[2]  As such, it appears the entirety of his litigation practice, particularly in the civil rights arena, totals less than six years (his Affidavit states that the duration of this practice is closer to five years).  As with Mr. O'Connor, Mr. Bosman has not provided any

---

[2]     In March 2016, Mr. Bosman, then a bankruptcy attorney, was suspended from practice by the Minnesota Supreme Court.  *In re Disciplinary Action Against Bosman*, 876 N.W.2d 308, 308 (Minn.), *reinstatement granted,* 880 N.W.2d 599 (Minn. 2016).  Mr. Bosman received a 60-day suspension, and his license was conditionally reinstated on June 15, 2016.  His conditional reinstatement was revoked on May 1, 2017. *In re Disciplinary Action against Bosman,* 894 N.W.2d 146 (Minn.), *reinstatement granted,* 901 N.W.2d 917 (Minn. 2017).  His license was reinstated on September 27, 2017.  *In re Disciplinary Action against Bosman*, 901 N.W.2d 917 (Minn. 2017).

documentation, whether through third-party affidavits or court awards approving any hourly rate for him, and accordingly the Court must use its own judgment.  Defendants suggest that an hourly rate of $250 might be appropriate given Mr. Bosman's *bona fides* and the paucity of supporting information provided by the Plaintiff for the hourly rate sought. This rate is also comparable to the rate awarded by this District for a civil rights attorney with comparable experience. *See Yanish*, No. 16-3030 Doc. 33 at p. 8; *Rosen*, 13 F. Supp. 3d at 951 (awarding $225 per hour).

Lastly, we turn to Mr. Cobbett, for whom Plaintiff requests $400 per hour.  Mr. Cobbett, according to his Affidavit, has been licensed since January 2021.  Mr. Cobbett was present in court for the trial of this matter, but did not participate in any way in the presentation of the case.  His work in this matter was substantively similar to that of a paralegal (paralegal work is, as the court is aware, generally administrative, and of a type for which the Court does not permit taxation as costs under Rule 54).  An appropriate rate for Mr. Cobbett would be, at most, $200 per hour. Just as this District in *Yanish* reduced the rate for an attorney guided by a more experienced attorney, this Court should consider Cobbett's novice status. No. 16-3030 Doc. 33 at p. 8.

**B.    Plaintiffs' Time Entries Are So Vague as to Be Nearly Unintelligible, and Reflect Enormous Amounts of Overbilling and/or Billing for Work For Which Fees Are Not Taxable.**

Plaintiff is not entitled to recover claimed fees for recorded billing entries which are vague and non-specific.  All hours billed must be supported by specific and precise billing records.  *H.S., Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir. 1991).  Time records that lump together multiple tasks make it impossible for the Court to determine or evaluate the

records' reasonableness.  *Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 971 (D.C. Cir. 2004).  The documentation offered in support of the hours worked must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation.  *United Slate, Tile & Composition Roofers v. G & M Roofing & Sheet Metal Co.,* 732 F.2d 495, 502 n. 2 (6th Cir. 1984).  The fee petitioner should maintain billing records "in a manner that will enable the reviewing court to identify distinct claims." *Hensley*, 461 U.S. at 436.  Where the documentation of hours is inadequate, the court may reduce the award accordingly.  *Id.* at 433.

Where time entries "are so vaguely generic that the Court cannot determine with certainty whether the activities they purport to describe were . . . reasonable," the petitioner has not met his burden.  *Cobell v. Norton*, 407 F.Supp.2d 140, 158 (D.D.C. 2005).  The "application must be sufficiently detailed to permit the District Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1327, *Miller v. Holzmann*, 575 F.Supp.2d 2, 21 (D.D.C. 2008); *see also Meriwether v. Coughlin*, 727 F. Supp. 823, 827 (S.D.N.Y. 1989) (holding that that entries such as "telephone conferences with defendant" and "reviewing new client material" were too vague to adequately assess reasonableness, and deducting 15 percent from the fee request in recognition of this vagueness).

Here, Plaintiff's counsel have not submitted any actual billing records.  Rather, they have submitted what appear to be Excel spreadsheets of their respective billing.[3]  In each case, the information provided is exceedingly vague, to the point that it prevents the Court from intelligently determining what if any fee award is appropriate, and in any case it is clear the records include work not reasonably necessary to prosecute this case.  Some relevant examples follow:

**<u>Kevin O'Connor</u>** *(See Affidavit of Kevin O'Connor and attached document, at Doc. 131-4 and 131-4)*:

- On Jan. 6, 2021, Mr. O'Connor bills for 3 hours' time for "review of analysis sent by attorney Bosman for handy."  This entry provides no detail about the work performed and the time spent is excessive for, apparently, reviewing a written document prepared by co-counsel.

- On Jan. 7, 2021, Mr. O'Connor bills for 2 hours for "review of court docket," and on the same date, bills for 3 hours for reviewing the Complaint.  These amounts of time are plainly excessive for the work involved.

- On Jan. 15, 2021, Mr. O'Connor bills for 3 hours for research into claims involving alleged "failure to intervene/medical intervention."  Plaintiff's claims based on these theories were dismissed by the Court on summary judgment.

- On Jan. 30, 2021, Mr. O'Connor bills for 2 hours for "prepare contracts/authorizations Hippa/Hitech."  It is unclear from the description how or whether this work relates to this case.

- On Feb. 7, 2021, Mr. O'Connor bills for 4 hours for "prepare and gather documents for pro hac vice motion."  The time spent is plainly excessive.

---

[3]     Interestingly, though the spreadsheets relate to work purportedly performed by three different attorneys, working in two separate firms located in different states, the spreadsheets appear very similar, raising the question of whether they were created by one person, and whether they were created on a contemporaneous, routine basis as the work involved was performed, or later, following the jury's damages award, to justify a large fee petition.

- On Feb. 15, 2021, Mr. O'Connor bills for 7 hours for "preparing responses to requests for production." This is excessive for the work performed.

- On April 16, 2021, Mr. O'Connor bills for 8 hours for "preparation of exhibit list for depositions." This is administrative work for which Defendants should not be asked to pay, and the time spent is plainly excessive to the extent it was attorney work at all.

- On May 12, 2021, Mr. O'Connor bills for 8 hours for "preparation of additional exhibits for depositions." Again, this is administrative work, and the time spent is unreasonable.

- On June 2, 2021, Mr. O'Connor bills for 2 hours for "research Paulette Quinn v. City of St. Paul." This work does not appear to relate to this case.

- On June 4, 2021, Mr. O'Connor bills for 4 hours for "research and review officer of year with Warrior reference." This appears to relate to Plaintiff's *Monell* claim, which was dismissed by the Court on summary judgment.

- On June 9-11, Mr. O'Connor bills for a total of 20 hours for "Travel to Minneapolis to meet with client and family and Bosman." This is not a reasonable use of attorney time in connection with the prosecution of this case, as the Plaintiff and sole family member who spoke at trial lives in Illinois, as does Mr. O'Connor.

- On July 5, 2021, Mr. O'Connor billed 5 hours for "preparation of drop box link of materials to review for expert." This is administrative work, as is the related entry on July 28, 2021 for "resending drop box link to expert."

- On August 6-10, 2021, Mr. O'Connor billed a total of 39 hours for reviewing videos of witness depositions he himself took, and for which he had previously billed many hours time for reviewing and highlighting the related deposition transcripts. This billing appears to represent duplicative churning of the Plaintiff's file, and should be stricken entirely.

- On August 21-22, 2021, Mr. O'Connor billed for 17.5 hours for "abstract" of two depositions, for which he had previously billed many hours reviewing videos and reviewing and highlighting transcripts. Again, this is excessive.

- On February 14 and April 14, 2022, Mr. O'Connor billed for 11.25 hours for "review of summary judgment motion," in addition to purportedly spending 7 hours on April 11, 2021 reviewing related exhibits. This is excessive.

- Between April 30, 2022 and May 16, 2022, Mr. O'Connor billed for a total of 75 hours for time spent researching and writing his response to Defendants' motion for summary judgment.  This is excessive for someone with purported expertise in civil rights matters sufficient to justify a $750 hourly rate.

- On July 7-10, 2022, Mr. O'Connor billed a total of 24 hours for "meeting with client and family in Minnesota."  This is not taxable attorney time, as it was not reasonably necessary in prosecution of the case.

- Beginning on July 23, 2023 (the day before trial began), Mr. O'Connor billed between 10 and 18 hours per day, every day, including weekend days, through the end of the day the jury delivered its verdict on damages.  This billing includes five purported 18-hour days.  Such work would be clearly excessive for someone who purports to be a seasoned civil rights litigator, particularly in light of the Court's practice of conducting trial between 9 a.m. and 5 p.m., Monday-Thursday.

**Paul Bosman** *(See Affidavit of Paul Bosman and attached document, at Doc. 131-2 and 131-3)*

- Mr. Bosman's first entry, for "prepare trustee documents; gather waivers; file," for 8 hours contains no date for work performed, nor detailed information about what task consumed what amount of time.  This is particularly problematic in light of the fact that Plaintiff was appointed as trustee for Cordale Handy's next of kin in April 2017, years before Mr. Bosman represented the Plaintiff.  *See The Matter of Wrongful Death of Cordale Handy, Decedent*, Court File No. 62-CV-17-1932 (Ramsey Cty. Dist. Ct. Apr. 12, 2017).

- For the calendar year 2019, Mr. Bosman bills *300 hours* – nearly eight 40-hour work weeks of time[4], for "Review BCA case file; weekly meeting w volunteer group each Thurs 6-9; minimum four hours prep each week."  The Court cannot award any time, much less 300 hours, for such a vague entry, where it is clear that the overwhelming majority of the time spent – preparing for and attending weekly volunteer group meetings – was not reasonably necessary to prosecute the case.  Mr. Bosman's client in this case is Kim Diane Handy Jones, not a "volunteer group." To the extent that time was spent in an effort by Mr. Bosman to market himself to

---

[4]    If awarded in full, at the $550 hourly rate requested by Plaintiff's counsel, this single entry, supported by a one-line description which appears to demonstrate that it is not case-related, much less reasonable time spent in prosecution of this case, would constitute *$165,000* in attorney billing.

handle this action, that work relates to business development, not the prosecution of this case, and is neither time for which Mr. Bosman could bill a client nor taxable as costs.  The Court must strike this time entirely from any fee award.

- On January 19-20, 2020, Mr. Bosman bills for 16 hours for "Review witness statements."  This is vague and excessive.

- On July 1, 2020, Mr. Bosman bills for 0.2 hours for an entry with no description whatsoever of work performed.

- On September 19-20, 2020, Mr. Bosman bills for 16 hours for "Doc review."  These entries are too vague to enable the Court to determine their reasonableness and must be stricken.

- On June 8, Mr. Bosman bills for 8 hours for "review SJ memorandums to understudy lead."  While it is unclear what is meant by "understudy," the use of the word suggests this work was duplicative of work performed by Mr. O'Connor.

- Between July 24 and August 1, 2023, Mr. Bosman bills 18 hours per day for work related to the trial.  Again, in the context of 8-hour court days, 4 days per week, this is excessive, particularly given that Mr. Bosman handled only one witness, and lead counsel, Mr. O'Connor, billed a similarly outsized amount of time for the same days.

**<u>Nathaniel Cobbett</u>** *(See Affidavit of Nathaniel Cobbett and attached document, at Doc. 131-6 and 131-7)*

- Like his colleagues, Attorney Cobbett bills for several 18-hour days during trial, from July 25-27.  Again, this is excessive, given Mr. Cobbett's minimal role in the trial (which appeared to be limited to assisting with audiovisual presentations during trial), and the fact that two other attorneys also billed enormous amounts of time on the same days.

The foregoing examples are representative of the problems with the records submitted by Plaintiff's counsel, but they are by no means exclusive.  Collectively, the records provided are far too vague to enable the Court to determine the appropriate amount of fees, and many entries reflect work which is duplicative, not reasonably related to the

handling of this case, and/or include block billing that denies the Court sufficient information to determine whether particular work should be compensated. This supports a reduction of the amount sought. *See, e.g., Dorr v. Weber*, 741 F. Supp. 2d 1022, 1037 (N.D. Iowa 2010) (reducing attorneys' fees award by virtue of vague block billing). In addition, the multiplication of work (including the presence of three attorneys in court, one of whom handled only one witness and one of whom made no presentation to the jury of any kind) is unreasonable, and any fee award the Court deems appropriate should include a commensurate reduction in the fees awarded. *See Orduno v. Pietrzak*, 932 F. 3d 710, 720 (8th Cir. 2019) (affirming district court's 40% fee reduction based on overstaffing and excessive hours billed).

**C.  The Court Should Reduce the Fees Awarded in Recognition of Plaintiff's Limited Success.**

In *Hensley*, 461 U.S. at 424, the United States Supreme Court provided guidelines for determining what amount of attorney's fees is reasonable. *Simpson v. Merchs. & Planters Bank*, 442 F.3d 572, 580 (8th Cir. 2006). If the prevailing party did not achieve success on all claims, this fee may be reduced, taking into account "the degree of success obtained." Id. at 436-37. "[T]he most critical factor" in determining the reasonableness of a fee award 'is the degree of success obtained.'" *Farrar*, 506 U.S. at 114 (quoting *Hensley*, 461 U.S. at 436). If "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Hensley*, 461 U.S. at 436.

Where a plaintiff achieves only a partial victory, "district courts should exercise their equitable discretion in such cases to arrive at a reasonable fee award, either by attempting to identify specific hours that should be eliminated or by simply reducing the award to account for the limited success of the plaintiff." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789-90 (1989). Where, as here, a plaintiff has prevailed on some but not all of her claims, the Court must determine whether the issues on which plaintiffs did not succeed are related to those on which plaintiffs won. "[U]nrelated issues must be treated as if they were separate cases and no fees can be awarded." *Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997).

Here, Defendants do not dispute that Plaintiff is a prevailing party within the meaning of Section 1988. That said, many of Plaintiff's claims, and several Defendants, were dismissed by the Court on summary judgment. While all of the dismissed claims arose from the same subject incident, some, such as Plaintiff's *Monell* claim and her claim for negligent supervision, asserted a larger set of facts and pattern of wrongdoing which were never supported by the facts, and which were properly dismissed. Accordingly, Defendants respectfully request a commensurate reduction in any fee award which the Court deems appropriate in this action. *See Orduno*, 932 F.3d at 720 (affirming 20% reduction based on plaintiff's limited success).

### D.    The Court Should Deny Any Multiplication of the Lodestar Amount.

Despite their limited success, Plaintiff's counsel seeks not only the full lodestar amount, but a 2.5x multiplier of that amount. No multiplication of the lodestar amount is warranted herein, much less the enormous multiplication sought.

"A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee is wholly consistent with the rationale behind the usual fee-shifting statute." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). "Neither complexity nor novelty of the issues . . . is an appropriate factor in determining whether to increase the basic fee award." *Blum v. Stenson*, 465 U.S. 886, 898–99 (1984). "There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates." *Id.*

"Although upward adjustments of the lodestar figure are . . . permissible, such modifications are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts. *Pennsylvania*, 478 U.S. at 565. The quality of representation is generally reflected in the reasonable hourly rate. The quality of representation "may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of services rendered was superior to what one should reasonably expect in light of the hourly rates charged, and that the success was 'exceptional.'" *Blum*, 465 U.S. at 899; *see also Pennsylvania*, 478 U.S. at 566 ("the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of 'double counting'"). Additionally, "[b]ecause acknowledgment of the 'results obtained' generally will be

subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award." *Blum*, 465 U.S. at 890.

In *Hendrickson v. Branstad*, 934 F.2d 158, 163 (8th Cir. 1991), the Eighth Circuit Court of Appeals reversed a district court's finding that a lodestar enhancement of 25 percent was proper in a Section 1983 civil rights case. The court noted that the plaintiff/appellee's lawsuit was the catalyst for legislative change and that the plaintiff/appellee was a prevailing party under Section 1988. Applying *Pennsylvania*, 478 U.S. at 566, the court held:

> The record does not contain specific evidence establishing that an enhancement based on exceptional results was necessary to provide counsel with a reasonable fee. On the contrary, the record in this case establishes that the lodestar amount provided a reasonable fee to Hendrickson's three attorneys.

*Id.* The *Hendrickson* court further stated:

> Under this standard, the district court improperly granted a contingency enhancement. We think the court granted the enhancement based on risks unique to Hendrickson's particular case. According to the court, a contingency enhancement was "appropriate and reasonable given the highly contingent and speculative nature of plaintiffs' action." The court found that Hendrickson's lawsuit was highly contingent because it "involved complex federal issues and was 'akin to a case of first impression.'" However, as indicated, considerations relating to the complexity and novelty of the issues will already be reflected in the lodestar amount, and cannot be used again to increase the fee.

*Id.* (citations omitted); *see also Forshee v. Waterloo Indus.*, 178 F.3d 527 (8th Cir. 1999) (reversing grant of fee enhancement because the case was not unusually difficult or complex).

In *Mische v. Sauro*, No. 3-94-217 (D. Minn. Aug. 17, 1994), at pp. 34-35, this Court denied an upward adjustment to the lodestar amount requested by the plaintiff. Plaintiff's counsel argued that an adjustment was appropriate "based on the exceptional success obtained which includes a significant excessive force finding against defendant Sauro . . . the largest monetary verdict in a civil rights case against a police officer." *Id.,* p. 34. The *Mische* court held, regardless, that "[n]otwithstanding Mische's success at trial, this case simply is not among the rare and exceptional cases worth of an enhancement for superior performance or results obtained." *Id.,* p. 35.

In *Hixon v. City of Golden Valley*, No. CIV. 06-1548 (RHK/JSM), 2007 WL 4373111, at *4 (D. Minn. Dec. 13, 2007), plaintiff Hixon, a Black man, sued the City of Golden Valley and several White police officers for excessive force, garnering what was then the largest punitive damages award against a police officer in Minnesota history. *Id.* Regardless, the *Hixon* court declined to grant a requested 20% enhancement to the lodestar amount:

> In the Court's view, by any reasonable measure Hixon achieved a high degree of success in this case . . . . Indeed, the sheer size of the jury's verdict and its award of punitive damages support that conclusion. Moreover, the Court is not oblivious to the "normal difficulties" inherent in obtaining a jury verdict against police officers in an excessive-force case, *see King v. Turner,* Civ. No. 05–388, 2007 WL 1219308, at *1 (D. Minn. Apr. 24, 2007), particularly where, as here, the case involves a "claim by a black plaintiff against white police officers [that] rests largely on the word of [the plaintiff] against that of the police." *Sanders–El v. Wencewicz,* 987 F.2d 483, 485 (8th Cir.1993). . . .
>
> The Court . . . concludes that an upward adjustment is . . . unwarranted. Given the "strong presumption" that the lodestar amount is the reasonable fee to which a prevailing plaintiff is entitled, *City of Burlington v. Dague,* 505 U.S.

557, 562 (1992), a court may increase that amount only in "rare and exceptional cases." *Pennsylvania,* 478 U.S. at 565. The Court does not believe that this is such a case, notwithstanding the high quality of representation by Hixon's counsel. Moreover, an upward adjustment must take into account the nature of the lodestar amount; generally speaking, an enhancement is appropriate when the lodestar amount is low relative to the complexity of the case. *See Daggitt v. United Food & Commercial Workers Int'l Union,* 245 F.3d 981, 990 (8th Cir. 2000) (affirming enhancement in complex case where lodestar amount was "modest"). Given that the lodestar amount in this case exceeds $400,000, the Court does not believe that further enhancement of that amount is "*necessary* to the determination of a reasonable fee" in this case. *Dague,* 505 U.S. at 562 (emphasis in original).

*Hixon*, 2007 WL 4373111, at *5.

An enhancement to the lodestar amount is available only where the lodestar amount is insufficient, and an enhancement is "necessary." *Dague*, 505 U.S. at 562. Here, the lodestar amount (that is, the reasonable hourly rate for each attorney, multiplied by the number of hours reasonably spent) will inevitably represent six figures in attorney billing. The lodestar amount is more than sufficient, given the relative lack of complexity of this case, and comparable to or greater than what other counsel have been awarded in similar matters. For example, in a high-visibility case in which a trustee brought suit under Section 1983 against the City of Austin, Texas and named police officers in connection with a death which resulted from an officer-involved shooting, and the jury awarded damages totaling $67,105,500[5], the Court awarded a total of only $167,600.00 in attorneys' fees. *See Nobles v. Egal,* No. A-19-CV-389-ML, 2022 WL 3971048, at *16 (W.D. Tex. Aug. 31, 2022). An increase to the lodestar amount would constitute a pure, impermissible windfall.

---

[5]     This amount was reduced to $8,000,000 on remittitur. *Nobles v. Egal,* No. A-19-CV-389-ML, 2022 WL 3971048, at *16-17 (W.D. Tex. Aug. 31, 2022).

This case, as tried, involved only one issue:  whether or not the Defendant officers used excessive force.  The jury was asked only two questions on liability, and one question on damages, as to each Defendant.  This is not complex litigation.  Given the exceptionally high hourly rates sought by Plaintiff's counsel ($750, $550, and $400 per hour for Mr. O'Connor, Mr. Bosman and Mr. Cobbett, respectively), there is no indication the quality of representation or advocacy was superior to what the Plaintiff should reasonably have expected.  For these high hourly rates, Plaintiff should expect superior representation.  Just as in *Mische* and *Hixon*, there is no basis for an enhancement of the lodestar amount.

In addition, the cases cited by Plaintiff in support of a multiplier of the lodestar amount are completely inapposite.  The case principally relied upon, *Rajender v. Univ. of Minnesota*, 546 F. Supp. 158 (D. Minn. 1982) was a complex class action of a type (a gender discrimination case brought against a university) which the court noted was particularly unlikely to succeed at the time it was litigated.  The case involved eight years of litigation, during which time, "21% of the hours charged during the first 2.4 years of [one of the involved law firm's] existence were spent on the *Rajender* litigation."  *Id.* at 170.  Moreover, the plaintiff recovered success not only for herself but for a broad class of affected individuals, including the University of Minnesota agreeing to fundamental changes in its employment practices to minimize the risk of future gender discrimination.  None of those factors, nor anything similar, are present here. *Guam Soc'y of Obstetricians & Gynecologists v. Ada,* 100 F.3d 691(9th Cir. 1996) involved advocacy challenging a law instituted in Guam which outlawed virtually all abortions.  In that instance, the court increased the lodestar amount, based in large part on the fact that "this was an 'undesirable'

28

case given its visibility and controversial nature in Guam's small and predominantly Catholic community." *Id.* at 695. Again, that situation is wholly different from the present case.

Lastly, Plaintiff cites to the case of *Gomez v. Gates*, 804 F. Supp. 69 (C.D. Cal. 1992), in which a lodestar multiplier was applied. That case contains some illustrative language relevant to the matter at bar:

> There is nothing inherently undesirable about excessive force cases. The common denominator of most of them is that the force allegedly used upon the plaintiff was disproportionate to the seriousness of the crime he was suspected of committing.
>
> A plaintiff who was a "suspect" at the time the allegedly excessive force was used against him, but in fact had committed no crime, is not always at a disadvantage when pitted against police officers who injured him seriously. The case brought on behalf of such a plaintiff, therefore, may not be an "undesirable" case as that term is used here, and there may be no need to enhance the fee determined by the lodestar calculation.

*Id.* at 77. The *Gomez* court went on to observe that at the time and place in which the case was brought (Los Angeles in the early 1990s), excessive force cases against police were particularly undesirable, because "questionable alleged practice[s]" of police were not well known to the public, and "how difficult it is for plaintiffs who are undeniably serious wrongdoers to get a jury verdict in their favor, and how nearly impossible it is for them to obtain a significant economic recovery." *Id.* at 78. The latter was demonstrated by the fact that the jury in *Gomez* awarded zero compensatory damages, despite finding that multiple officers had used excessive force in apprehending a robber. *Id.* at 70-78.

29

Simply put, in the Twin Cities in the present political climate, there is nothing "undesirable" about police excessive force cases.  To the contrary, jury verdicts like the $67 million awarded in *Nobles,* 2022 WL 3971048, and enormous settlements like the ones reached in the Justine Damond and George Floyd cases, have motivated lawyers to bring even the most marginal use-of-force cases to court.  The "undesirability" of such cases is nonexistent, and does not support a multiplier of the lodestar amount. Moreover, this case did not involve a decedent who had, according to the Plaintiff, committed any crime of which the involved officers were aware, and even the *Gomez* court noted that a "plaintiff who was a 'suspect' at the time the allegedly excessive force was used against him, but in fact had committed no crime, is not always at a disadvantage when pitted against police officers who injured him seriously." *Gomez*, 804 F. Supp. at 77.

The other factors cited by the Plaintiff are similarly unpersuasive.  Plaintiff's counsel contends that taking this case in some manner precluded them from other employment, when in fact Attorneys O'Connor and Bosman have many other active cases, including many use-of-force cases, and the two recently settled another case asserting an improper use of force, for $1,300,000.[6]  Counsel states that "time limitations" (i.e., the fact that this case was sued out shortly before the statute of limitations ran) supports an increase to the lodestar amount.  This cannot be squared with the fact that Mr. Bosman seeks reimbursement for *300 hours* of time purportedly incurred in 2019, nor with the fact that the case had previously been filed, then dismissed, meaning that a draft Complaint already

---

[6]   *See*   https://www.fox9.com/news/city-of-st-paul-reaches-settlement-with-family-of-marcus-golden-8-years-after-he-was-killed-by-police.

existed long before the one in the present case was filed.  Lastly, counsel contends that the time and labor required to litigate this matter support a multiplier of the lodestar amount. To the extent this case was unusually burdensome in "time and labor" (which it was not), that fact is already reflected in the lodestar, and does not support any multiplication of that amount.

### III.   PLAINTIFF'S BILL OF COSTS SEEKS REIMBURSEMENT OF MANY COSTS WHICH ARE NOT PROPERLY TAXED TO DEFENDANTS.

As the prevailing party, Plaintiff is entitled to tax at least a portion of her costs against the Defendants pursuant to Rule 54 of the Rules of Civil Procedure.  Unfortunately, in this instance Plaintiff's counsel seeks taxation of many thousands of dollars in costs which are not taxable pursuant to Rule 54 and Local Rule 54, as interpreted by the Bill of Costs Guide for the United States District Court for the District of Minnesota, dated July 2021 (the "Guide").   The impermissible costs sought fall into one of the following categories:

#### A.   Attorney Travel and Meals.

The Guide, at p. 10, clearly indicates that costs associated with "[t]ravel and expenses of counsel, including investigation expenses," are not generally taxable to the opposing party.  Here, Plaintiff's statement of costs, at Doc. 128-2, includes thousands of dollars for attorney travel, meals, parking and related costs which are not taxable.  *See* the timeframes between May 19-28, 2021, July 1, 2021, July 8-10, 2022, January 17-25, 2023, July 2-5, 2023 and July 23-August 2, 2023.  The inclusion of attorney meals is particularly curious.  Presumably counsel would have eaten whether or not he was traveling for work,

and meal costs are neither customarily billed to clients nor properly taxable as costs. All travel, meal and parking costs must be stricken from any fee award herein.

**B.     Expert Fees.**

Plaintiff seeks more than $20,000 in costs in connection with his experts, Ronald Wright and Charles Drago. In *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437 (1987), the Supreme Court held that expert witness fees are only recoverable pursuant to a contract or statutory authority. The Supreme Court has held that Section § 1988 did not authorize shifting of expert witness fees to the losing party. *West Virginia Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 102 (1991).

After *Casey*, Congress amended § 1988 to provide for recovery of expert witness fees under 42 U.S.C. §§ 1981 and 1981a, but did not include § 1983. 42 U.S.C. § 1988(c). Accordingly, expert fees are not awardable to a prevailing party in a Section 1983 action. *Jenkins ex rel. Jenkins v. Missouri,* 158 F.3d 980, 983 (8th Cir. 1998) (noting that Congress amended § 1988 "to authorize the award of expert fees" in cases brought under only §§ 1981 and 1981(a)); *see also King v. Turner,* No. CIV 05-388 (JRT/FLN), 2007 WL 1219308, at *3 (D. Minn. Apr. 24, 2007) ("Expert fees are not recoverable in a § 1983 action.") and *Der v. Connolly,* No. 08-CV-6409 (PJS/JJG), 2011 WL 31498, at *6 (D. Minn. Jan. 5, 2011), *aff'd in part,* 666 F.3d 1120 (8th Cir. 2012) (disallowing award of expert fees as part of costs petition in Section 1983 case, on the basis that Section 1988 does not provide for the award of expert fees in Section 1983 actions).

In light of the foregoing, there is no lawful basis for any award of expert fees herein, and Plaintiff's expert fees must be stricken from any award of costs. In addition, the fact

that Plaintiff's counsel seeks fees for experts, where such an award is plainly contrary to the law, should give the Court pause with respect to the reasonableness of the hourly rates sought by counsel, as it suggests their expertise in civil rights litigation does not support these rates.

**C.     Mail and Delivery Fees.**

The Guide, at p. 10, states that "[f]ees for postage, delivery (including delivery services such as Federal Express), and notary" are not taxable.  Notwithstanding, Plaintiff seeks reimbursement for a $203.71 FedEx charge dated April 3, 2021, as well as similar charges on August 10, 2021 and December 21, 2021 (apparently for sending materials to an expert who was not disclosed and did not testify at trial, then having the materials returned).  These costs must be stricken.

**D.     Deposition Fees.**

In years past, the Court's practice was that only deposition transcripts used in court could be taxed as costs.  The current Guide has modified that standard somewhat, providing, at p. 5, that "[d]eposition transcripts (printed or electronically recorded) are taxable by the Clerk if the transcript was necessarily obtained for use in the case.  The Clerk may tax deposition transcripts when . . . [t]he deponent testified at trial or a potential trial witness; . . . [t]he deposition was admitted into evidence; . . . or [t]he requesting party explains why the transcript was necessarily obtained."  Guide, p. 5.  The Guide further states:  "Important:  In order to tax the costs for an electronically recorded and printed deposition transcript, the party taxing the cost must explain why both types of transcripts were necessarily obtained for use in the case."  *Id.*  The Guide goes on to state that

"[t]ranscripts used primarily for trial preparation or discovery" are not taxable by the Clerk. *Id.,* p. 6.

Here, Plaintiff seeks reimbursement for costs related to the depositions of Jill Mollner, Nathaniel Younce, Mikko Norman, Jordan Wild, Markeeta Blakney, Todd Axtell, Dao Vang, Sean Zauhar. None of the deposition transcripts were presented, in whole or in part, at trial, and ultimately Mr. Wild, Mr. Axtell and Mr. Zauhar did not even testify at trial. Under the circumstances, none of the transcripts were "necessarily obtained for use in the case." They were in fact primarily or entirely used for trial preparation or discovery, and associated costs should not be taxed. At most, the Court may conclude that counsel may reasonably tax the transcript costs for depositions of individuals who actually testified at trial (i.e., Norman, Younce, Vang, Mollner and Blakney).

In addition to the cost of transcripts, Plaintiff seeks thousands of dollars for videographers' recordings of all of their depositions. The undersigned has, in 25 years of practice, seen depositions preserved on video in only a few instances prior to this case, for particular reasons specific to the cases in which they were taken (such as the anticipated unavailability of a witness at trial). Here, the videos were never presented, nor even proffered at trial, and counsel has offered no explanation why the Court should tax costs for videographers. No costs can be taxed in connection with the costly, unnecessary video recordings of depositions taken by the Plaintiff.

### E.   Undocumented Costs.

The Guide, citing Local Rule 54.3(c)(1)(A), provides that "all bills of costs must be verified. Attached to the bill of costs should be copies of any vouchers, bills, canceled

checks, or other documentation (i.e., explanatory memorandum or affidavit) showing the amount of the costs and/or their purpose."

Here, Plaintiff's counsel has submitted nothing, other than a vague and unsupported "Statement" from counsel, which documents the costs sought.  This wholesale lack of documentation alone should give the Court pause, if not cause the Court to simply reject Plaintiff's costs petition in its entirety, until and unless Plaintiff provides documentation required under the applicable rules.

In particular, the "Statement" provided includes numerous entries without any explanation of what the costs are, and/or how they are properly taxable under the applicable rules.  Problematic entries include, but are not limited to, the following:

- April 2, 2021 – "Invoice #11715:  Docusign" – $3.00

- April 25, 2021 – "Invoice #11742" – $51.50

- June 3, 2021 – "Check #6270:  INV: 05210026 – Handy Binders" – $3,158.00

- July 3, 2021 – "Expense" – $165.68

- July 9, 2021 – "Expense:  Minneapolis – Handy" – $75.65

- July 11, 2021 – "Expense:  Handy" – $80.00

- July 12, 2021 – "Expense:  Minneapolis" – $169.53

- June 7, 2022 – "Check #7146:  Handy Jones – Infotrack – Docusign" – $6.00

- June 27, 2022 – "Expense" – $428.70

- July 8, 2022 – "Expense:  Butcher – Handy" – $106.10

- July 9, 2022 – "Expense:  Target – Handy" – $10.55

Because Plaintiff's counsel has entirely failed to document what several of their claimed expenses are, or how they relate to this case, the Court should strike each such vague and unsupported entry from any bill of costs taxed in this action.

## CONCLUSION

To the extent the Court holds that it is appropriate to award fees and costs herein, Defendant asks that the Court reduce the amount of fees and costs awarded, based on the lack of supporting documentation and the excessive and unreasonable nature of the fees and costs sought by Plaintiff and for the reasons stated herein.

Dated:  September 14, 2023

LYNDSEY M. OLSON
City Attorney

*/s/ Anthony G. Edwards*
ANTHONY G. EDWARDS, # 0342555
Assistant City Attorney
750 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, MN 55102
(651) 266-8728
anthony.edwards@ci.stpaul.mn.us
Attorneys for Defendants