## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Kim Diane Handy Jones, as Trustee for the
next of kin of Cordale Quinn Handy,
    Plaintiff,

vs.

City of St. Paul, Minnesota; St. Paul Police
Officer Mikko Norman, in his individual and
official capacities; St. Paul Police Officer
Nathaniel Younce, in his individual and
official capacities,
Defendants.

Civil File No. 20-CV-707 (DSD/ECW)

---

## MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## POST-TRIAL MOTIONS

---

This matter is before the Court based upon a number of Motions brought by

the Defendants following a jury verdict in favor of Plaintiffs.  By those Motions,

Defendants seek judgment changing the jury verdict as to either liability or

damages or a new trial.[1]  Defendants' Motions effectively ask this Court to

overrule its own well-reasoned rulings and decisions made throughout the

course of the trial, based on ineffective and unpersuasive arguments this Court

---

[1] The Motions do not distinguish between the Defendants.  The Motion for a
new trial thus includes Officer Mikko Norman who was found not responsible
by the jury.  Why he would seek a new trial, and the risk of liability, remains
unexplained.

largely has already rejected. Given the decision by the jury and the applicable legal standards, the Motions should be denied in full.

## PROCEDURAL STATUS

This case was tried to a jury at the end of July this year. It arises from the death of Cordale Quinn Handy (Handy), shot by two officers from the St. Paul Police Department. This Court bifurcated the trial – completing the liability jury verdict before the jury heard damages evidence and decided those issues. Both compensatory and punitive damages were tried in a single trial.

Several liability facts during the trial were undisputed:

- St. Paul was vicariously liable for the officer's conduct.

- Handy did not fire a gun at the officers.

- Handy was shot by both officers, with Officer Nathaniel Younce firing first.

- If Handy did not point a gun at either officer, then both Plaintiff and Defense experts agreed that the shooting was not justified. (Ijames: T-555-56; Drago: T-434-35).

The factual dispute thus revolved around whether Handy pointed a gun at either of the Officers. The Officers testified he pointed a gun at Norman. (Norman: T-124, 134-35; Younce: T-209-10). Younce saw him point the gun at

Norman twice; the first time he did not fire. (T-209-10). Two witnesses, Markeeta Johnson-Blakney (Blakney) and Jill Mollner (Mollner) testified that Handy never pointed the gun at the Officers. (T-76; 329). The only expert to testify, Dr. Ronald Wright, a pathologist, testified it was impossible for Handy to have been holding a gun when he was shot. (T-271, 302-303).

As to damages, the Defendants offered no evidence contradicting the testimony of the witnesses Plaintiff offered.

The nature of the trial must also be kept in mind when evaluating the Defendants' various motions. Liability and damages were bifurcated without objection from any party. Evidence that was heard at the damages trial had no impact in the liability verdict. This Court properly ruled on the admissibility of evidence in the context of the issues then before the jury. The damages trial, however, was not bifurcated. The jury thus heard evidence and argument about compensatory damages and punitive damages in one trial and decided both on a single special verdict form. As a result, the evidence and arguments that might be improper to compensatory damages were proper in addressing punitive damages. Defendants, throughout their Memorandum often fail to consider the procedural posture of the case.

**ARGUMENT**

Plaintiff understands that Defendants' Motions will be decided without oral argument. She will thus have no opportunity to respond to Defendants' Reply. It is thus important that the Reply not raise new issues or arguments, which are generally improper in a Reply. *Fed. Trade Comm'n v. Neiswonger,* 580 F.3d 769, 775 (8th Cir. 2009). To the extent that Defendants attempt to do so, this Court should ignore those new issues or arguments.

1. <u>The jury verdict on liability is consistent since the jury reached a principled decision to find only one officer liable given the evidence.</u>

Following instructions from the Court, and closing arguments by counsel, the jury deliberated on liability. It returned a verdict finding Younce liable, both for the federal violation and for the state law wrongful death claim. The jury found Norman not liable.

Defendants assert that the jury verdict is inconsistent. They argue since both Officers fired and struck Handy, and the fire by the Officers was separated by a short time, the jury verdict is inconsistent. The Defendants assert that if the jury found one Officer liable it had to find the other liable. Such an argument ignores the law and the evidence the jury heard.

Initially, it should be noted that the Defendants agreed to the liability special verdict form. Defendants agreed to a separate line item on the liability

4

verdict form for each Defendant Officer. (T-460-61).  When given the opportunity to object to the liability verdict form as given, Defendants' counsel reiterated three separate times that he was not objecting to the verdict form's language, and his only concern "about the risk of an inconsistent verdict" was specifically related to "separately asking about them about the federal and state claims, because [whether the officers used excessive force] is at the gravamen of both claims." (T-460-61).  Therefore, this issue has been waived.  *Reorganized Church of Jesus Christ of Latter Day Saints v. U.S. Gypsum Co.*, 882 F.2d 335, 338 (8th Cir. 1989).

A new trial based upon an inconsistent jury verdict will be granted "only if there was 'no principled basis upon which to reconcile the jury's inconsistent findings.' *Bird v. John Chezik Homerun, Inc.*, 152 F.3d 1014, 1017 (8th Cir.1998)." *Top of Iowa Co-op. v. Schewe*, 324 F.3d 627, 633 (8th Cir. 2003); *see also Bayes v. Biomet, Inc.*, 55 F.4th 643, 647-48 (8th Cir.) (finding a "principled basis" to affirm jury verdict).  "To be inconsistent, a jury verdict must reach contradictory factual findings."  *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008).  The courts are "reluctant to delve into the minds of the jurors to determine the reasons for apparently inconsistent verdicts."  *United States v. Opare-Addo*, 486 F.3d 414, 416 (8th Cir. 2007).  The jury is presumed to have followed instructions as given.  *Muhammad v. McCarrell*, 536 F.3d 934, 938 (8th

Cir. 2008). "The jury is free to believe the testimony of any witness in its entirety, or to reject that testimony as untrustworthy. The jury is also free to accept the testimony of one or more witnesses in part only, and thereby to create its own version of the events at issue." *United States v. One Star*, 979 F.2d 1319, 1321 (8th Cir. 1992). Rule 50 motions should only be granted when there is a "complete absence of probative facts to support the verdict and when the record contains 'no proof beyond speculation' to support the verdict. *Heaton v. The Weitz Co.*, 534 F.3d 882, 889 (8th Cir. 2008) (internal citations and quotations omitted)." *Krekelberg v. Anoka Cnty.*, 439 F. Supp. 3d 1143, 1159 (D. Minn. 2020), *aff'd in part, vacated in part, remanded sub nom. Krekelberg v. City of Minneapolis*, 991 F.3d 949 (8th Cir. 2021). Here, the jury verdict is supported by the evidence as this Court found following the liability trial.

The jury was asked to determine if one either or both of the Officers violated Handy's rights in firing their weapons (the federal claims), or acted with willful and wanton disregard in causing his death (the state law claims). Because it was undisputed that both Officers fired at Handy, killing him, the only liability question was whether their actions were objectively unreasonable given the totality of the circumstances, amounting to conduct violating 42 U.S.C. § 1983 or Minn. Stat. § 573.02. That issue turned on whether Handy pointed his gun on one or both of the Officers since all of the evidence was that if he did not do so,

the Officers were not justified in shooting Handy. The jury determined the Officer to fire first, Younce, was legally liable under both legal theories.

The undisputed evidence from both experts was that an objectively reasonable officer had no basis to fire upon Handy unless he was pointing his gun at one of the involved Officers, here Norman. Even Officer Norman testified he would not have begun firing unless the gun was pointed directly at him (T-124), but confirmed that he only began firing when his partner did so (T-134-35). Two witnesses testified that Handy never pointed his gun at Norman. (T-76, 329). Blakely further testified Handy was complying with the Officers' shouted commands. (T-79). Both Officers testified that Handy pointed the gun at Norman on two occasions. (T-134-35; 209). An expert, Dr. Wright, testified that Handy was not holding a gun at the time of the shooting given his injuries. (T-282). He had his hand up with his forearm and pinkie exposed to the shooter. (T-285). One of the shots went into Handy's leg in a manner only possible if he was on his back with his legs in the air. (T-293). The jury thus could have believed the lay witnesses, Dr. Wright's expert testimony and the physical evidence and determined Younce had no basis upon which to open fire.

The two Officers were then in different circumstances in two respects material to the verdict. Officer Younce fired first. Under cross examination, Norman testified that he shot when he heard his partner fire. (T-135-36). His

shooting was thus triggered by Younce opening fire first. As such the jury could conclude that Norman fired because his partner did so. Since the triggering event for the legal violation was the shooting, Younce was liable and Norman was not. Plaintiff's counsel argued this distinction in closing. (T-604-606). The jury verdict is based upon a "principled basis." *Top of Iowa*, 324 F.3d at 633.[2]

Given this scenario, consistent with the evidence, the jury verdict is supported by a "principled basis" and should be upheld.

2. <u>The damages awarded are not excessive given the law and the undisputed evidence offered by Plaintiffs.</u>

In their Motion, the Defendants seek remittitur from the $10,000,000 awarded by the jury to $1,000,000,[3] largely on the basis that no evidence exists to support a damages award. Then, using a comparison to old and selective verdicts, they assert that $1,000,000 is the maximum amount a reasonable jury could award here. In determining damages, the jury was asked a single question – it was not asked to award damages on the constitutional claim separate from the wrongful death claim. The verdict thus reflects both kinds of harm. The

---

[2] It is important to remember that the jury found Younce acted with willful or reckless disregard for Handy's life twice. First, it found Younce liable. Then, it made the same finding in awarding punitive damages. (T-459-61, 468-73).
[3] The Defendants do not seek remittitur of the $1,500,000.00 punitive damages award. That award is thus not subject to change by this Court.

record and law fully support the damages awarded and it should be upheld by this Court.

      a. The damages verdict is not so excessive as to shock the judicial conscience.

Minnesota law guides the determination whether the verdict is excessive. *Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1019 (8th Cir. 2007). Minnesota allows a "new trial because of excessive damages that appear to have been given under the influence of passion or prejudice or are not justified by the evidence." *Myers v. Hearth Technologies*, 621 N.W.2d 787, 792 (Minn. App. 2001). A verdict is excessive if "it could only be the result of passion or prejudice, or when the award is the result of speculation rather than the evidence presented at trial". *Willis v. Indiana Harbor Steamship Co.*, 790 N.W.2d 177, 188 (Minn. App. 2010). "In determining whether the verdict is excessive, the trial judge must consider all the evidence, the demeanor of the parties, and the circumstances of the trial." *Johnson v. Washington County*, 518 N.W.2d 594, 602 (Minn. 1994) (citations and quotations omitted).

In considering a motion for remittitur, the Court should not grant the motion because it would have awarded an amount different from that determined by the jury. *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 553 (8th Cir. 2013). A remittitur is reserved for cases "where the verdict is so grossly

excessive as to shock the judicial conscience." *Lincoln Composites*, 825 F.3d at 459 (quoting *Bennett*, 721 F.3d at 553). "In this circuit, a district court should order remittitur 'only when the verdict is so grossly excessive as to shock the conscience of the court.' *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir. 1983). A verdict is not considered excessive unless there is 'plain injustice' or a 'monstrous' or 'shocking' result. *Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir.1988)." *Eich v. Bd. of Regents for Cent. Missouri State Univ.*, 350 F.3d 752, 763 (8th Cir. 2003)

In their argument, Defendants largely ignore the combined nature of the damages awarded by the jury. Instead, they focus their argument on wrongful death damages under Minnesota law. Since the damages were not separated, and Defendants do not argue about the appropriate level of damages for the constitutional harm, their argument fails. *See Adams v. Toyota Motor Corp.*, 867 F.3d 903, 921 (8th Cir. 2017), *as corrected* (Aug. 14, 2017) (impossible to tell damages awarded for past versus future pain and suffering given single damage amount, thus prejudgment interest could not be awarded).

Under Minnesota law, "[t]he proper measure of damages for wrongful death, then, is the pecuniary loss resulting from the death, not the value of a human life in the abstract. Minn. Stat. § 573.02; *Fussner v. Andert*, 261 Minn. 347, 113 N.W.2d 355 (1961)." *Ahrenholz v. Hennepin Cnty.*, 295 N.W.2d 645, 648 (Minn.

10

1980). "Although damage awards should have an adequate factual basis and should not be the product of passion or prejudice, the jury is not bound by any fixed or precise mathematical rules in reaching an amount." *Cummins v. Rachner*, 257 N.W.2d 808, 814 (Minn. 1977). The jury is uniquely competent to determine damages in a wrongful death action. *Ahrenholz,* 295 N.W.2d at 648. Decades ago, in discussing the wrongful death statute, the Minnesota Supreme Court recognized:

> Conversely, there is a growing appreciation of the true value to the parent of the rewards which flow from the family relationship and are manifested in acts of material aid, comfort, and assistance which were once considered to be only of sentimental character.
>
> We have recognized in an action involving the death of a parent that the loss to the child of aid, counsel, and guidance is a pecuniary loss for which there may be recovery. We said:
>
> > '* * * To be included also are the imponderable elements of loss which arise because both wife and children have been deprived of the counsel, guidance, and constant, day by day aid which the normal father gives to such a family.'
>
> Since the good offices involved in the parent and child relationship are largely reciprocal, it should be assumed that damages for this loss are as real to one as to the other. Authorities relating to the subject of damage for the loss of consortium characterize loss of comfort and society as a damage having a pecuniary value.
>
> Moreover, it should be acknowledged that the death-by-wrongful-act statute is remedial in character and it is the court's duty to construe it liberally in light of current social conditions. In the recent case of *Shumway v. Nelson*, 259 Minn. 319, 322, 107 N.W.2d 531, 533, we did not hesitate to extend the application of the act in a case involving the marital-immunity doctrine where we felt to do so was in accord with present-day needs. We

there said, 'The statute is remedial in character and thus requires a liberal construction.' In 1949 we extended the application of the statute to apply to death of a viable fetus resulting from prenatal injury.

We have often said that the measure of damages is the money value to the survivor of the continuance of decedent's life, measured by the money value of what the evidence shows the decedent probably or with reasonable certainty would have contributed in money, property, or services during the remainder of his life. Yet in case after case we have approved verdicts in amounts which have apparently exceeded the measure permitted by the strict pecuniary-loss rule. It may also be said that courts have been loath to scrutinize verdicts closely in an attempt to break them down to determine the actual money loss established.

*Fussner*, 261 Minn. at 353–55, 113 N.W.2d at 359–60.  In this case, even assessing the wrongful death award separately from the indivisible award for the violation of Handy's constitutional rights, courts are duty-bound to construe the value of the loss of a child or sibling "liberally in light of current social conditions." *Fussner*, 261 Minn. at 354, 113 N.W.2d at 359.  Pecuniary loss includes the loss of "comfort."  *Steinbrecher v. McLeod Co-op. Power Ass'n*, 392 N.W.2d 709, 715 (Minn. App. 1986).

The jury was instructed:

As a result, you must consider monetary damages for the family members represented by plaintiff as the trustee for Mr. Handy's next of kin. That means you will determine an amount of money that will fairly and adequately compensate Mr. Handy's next of kin for the loss that they suffered as a result of his death. In doing so, you should consider what Mr. Handy would have provided to his next of kin if he had lived. Consider the following factors in making that determination:
Number 1, his past financial contributions to the family.
Number 2, his life expectancy at the time of his death.
Number 3, his health, age, habits, talents, and successes.

12

Number 4, all reasonable expenses incurred for his funeral and
burial.
Number 5, the counsel, guidance, and aid he would have given his
family.
And number 6, the advice, comfort, assistance, companionship, and
protection that he would have provided for his family if he had
lived.

(T-830-31). It was thus informed of the relevant factors to consider in awarding

damages. The Court included an instruction that if the jury did not find

significant evidence of compensable damages, it could award $1.00 on the

constitutional claim. (T-832). And, again, the jury is presumed to have followed

instructions. *Muhammad*, 536 F.3d at 938.

In this legal context then, the issue is whether the evidence supports the

damages awarded in this case. It does.

The jury heard that Handy "dared to dream." (T-748). He sought to make

his Mother proud. (T-748). He would help anyone – he had a good heart. (T-

752). For example, on one occasion, he gave his coat to a homeless person. (T-

752). His neighbor described him as "The most kind, caring, compassionate,

thoughtful, respectful, pers- -- I mean (emotional) --." (T-316). This evidence

demonstrated the kind of person Handy was and the extent of the loss to his

next-of-kin, his Mother and siblings. The Defendants presented no witnesses

and little circumstantial evidence suggesting otherwise.

He was working, including many overtime hours, for the Salvation Army. (T-722-23).[4]  He was working his way up the ladder and had become one of the lead people.  (T-722).  He was happy and considered it a good job.  (T-723).  He was making "big money" and was "on his way."  (T-730).  Handy also had interior decoration skills, learned from his Mother's husband.  (T-759).

The jury heard about the relationships between Handy and his family. Family was very important to Handy.  (T-721).  He had a loving and close relationship with his Mother.  He spoke to her on a daily basis and they loved their conversations.  (T-725, 753).  He was a "Mama's boy."  (T-725).  This relationship became even closer after his Mother's husband died.  (T-726). Handy took over his role as the provider of counsel for his Mother.  (T-726). Handy took care of her after her back surgery, including caring for his younger siblings because she could not.  (T-754).  She wore an angel ring he gave her.  (T-746).  She also included him on her charm bracelet.  (T-747-78).

Handy had several siblings whose losses the jury considered.  Handy's Sister, Whitney, had a close relationship with her brother.  (T-756).  She relied upon him and, after his death, she began drinking and engaging in other

---

[4] Defendants object that Plaintiff's counsel stated Handy was working "like 60 hours per week" as being without evidentiary support.  (Defendants' Memorandum, page 7).  The testimony of his frequent and regular overtime supports the estimate by Plaintiff's counsel.

destructive behaviors. (T-756). No one else could get through to her. (T-756). She was described as "lost." (T-729). Such harm is compensable. *See Steinbrecher*, 392 N.W.2d at 715 ("She must be considered for what she is, and since her situation corresponds to the case law, it should be accorded the benefit of the current definition of 'pecuniary loss.'").

Handy provided similar emotional support to his younger Brother, Angel. (T-755). He was Angel's mentor, more like a father than a brother. (T-755). He talked to his Brother on the telephone regularly – "When you call the house, anybody pick up. Whoever pick up, that's who he's talking to." (T-728).

Handy was described as close to JaJuan, his older Brother, (T-726) his best friend. (T-757). They played video games together for hours. (T-758).

Handy also had a close relationship with his other Brother, Isaiah. (T-755). He would spoil Isaiah. (T-755). They spoke often. (T-728). Isaiah took his death very hard. (T-757).

Handy intended to return to Chicago to be near family. (T-728; T-758).

None of the evidence of the relationships Handy had with his family, his employment, or his personality was contradicted by any evidence offered by the Defendants. The undisputed evidence thus reveals an uncontradicted story of a young man finding his way forward, employed in a job he enjoyed, and maintaining a close relationship with his family. In many respects, he was the

glue holding the family together. The loss of that glue, of all of those relationships, was devastating. The jury saw that devastation and awarded damages accordingly.

In their Motion, the Defendants rely upon several claims to support the request for remittitur – the lack of financial support to the family; the excluded criminal charges; the minimal evidence about employment history or income; and no "actual evidence" of close relationships. None of these claims support remittitur given the undisputed evidence of the loss and the law related to each claim.

As to the first, the lack of financial support, the record is undisputed that Handy provided gifts for his family members. Some were large, some not so large. But, they were a sign of the relationship he had with his family and the importance of family to him.

Nothing in the law requires proof of financial loss and Defendants cite none. It is simply one of the considerations for the jury when awarding wrongful death damages. The lack of such a requirement is obvious – wrongful death cases are brought for children who die, such as *Fussner*.

As to the second, the excluded criminal charges, the Defendants assert that it was error to exclude evidence related to pending drug charges. As the analysis of the argument about alleged improper evidentiary rulings demonstrates (see

infra), that decision was well within this Court's discretion. Additionally, because the Court bifurcated the questions of liability and damages without objection, the evidence of criminal history was properly excluded from the liability phase of the trial and properly admitted during the damages phase.

As to the third, the minimal evidence of employment history and income, this is really a restating of the first basis. The jury heard, as discussed above, about his employment at the Salvation Army and his advancement there. Economic loss, however, was not a significant element to Plaintiffs' damages claims and thus an extensive discussion of that evidence was not necessary. The jury did hear about the gifts Handy gave to family members and others.

As to the fourth, the lack of "actual evidence" of the loss of aide, comfort and society, this argument rings the most hollow. The jury is entitled to believe testimony as it sees fit, in whole or in part. *One Star*, 979 F.2d at 1321. The jury heard from three witnesses about Handy's character and relationship with his family – Jill Mollner described Handy during the liability phase of the trial, while his then girlfriend, (Blakney) and his Mother (Handy-Jones) testified during both phases of the trial. The jury saw, as did the Court, how distraught Handy-Jones was as a result of her son's death. It even led the Court to enlist additional security. (T-42-44; 89-90; 655). If the Defendants thought that any of those witnesses provided inaccurate testimony, they were free to call the siblings or

any other witness to dispute the testimony of those three. The jury was free to accept or reject their testimony. Defendants do not identify the "empirical evidence supporting the nature of his 'advice, comfort, assistance and protection,'" (Defendants' Memorandum, page 8), which they believe should have been offered.

Instead, they simply assert that the damage award must have been based upon sympathy or pain and suffering of Handy. They offer no basis for such an assertion, besides its mere assertion. Such an argument should not be considered. *See Milligan v. City of Red Oak, Iowa,* 230 F.3d 355, 360 (8th Cir. 2000) (per curiam) (where party fails to support assertion with argument or legal authority, issue is deemed waived). The record, in fact, belies such a statement. If this jury had been inflamed by passion or sympathy, it would not have split the liability verdict. Instead of simply responding based upon passion or prejudice or sympathy, the jury carefully considered the evidence, reconstructed the events from the conflicting testimony, and returned a rational verdict. It took the same care in evaluating damages.

In any case, wrongful death damages are difficult to determine. No precise formula exists to determine those damages. *Johnson*, 506 N.W.2d at 640. As one expert put it in a case where a jury reached an award of $3,040,054.71 in wrongful death compensatory damages:

CASE 0:20-cv-00707-JRT-ECW    Doc. 148    Filed 11/10/23    Page 19 of 51

> I think everybody that works in this area knows that wrongful death cases
> ... are tough to measure because you're talking about a jury's
> determination of loss of a loved one, and the loss to maybe not just one
> person, but a number of people. And that's got so many variables, both in
> terms of what that jury panel looks like, what their experience has been in
> life, some of which you're never going to know, and how these [witnesses]
> come across, and how they move the jury to understand how hurtful the
> loss has been to their family. And it's—it's a crapshoot.
> Solum Dep. 95–96.

*Christian Builders, Inc. v. Cincinnati Ins. Co.*, 501 F. Supp. 2d 1224, 1233 (D. Minn.

2007).  Although it is not apparent on the cold pages of a transcript, throughout

the trial, the Court and jury were able to observe Handy-Jones crying through

particularly graphic portions of the trial, as well as her emotions and demeanor

when testifying about her late Son.

A review of the record, therefore, demonstrates that this verdict was fully

supported by the evidence.  It does not "shock the judicial conscience."  The

remittitur motion should be denied.

> b.  A comparison to other verdicts should not be undertaken, but
> even if it is, the remittitur motion should be denied.

In their desperate attempts to secure a reduction in the justified damages

award, the Defendants resort to an effort to compare prior jury verdicts.  In

doing so, they ignore the relevant law and the numerous awards of similar or

greater amounts, and recent settlements of similar cases.  As a result, this effort

too fails.

The Eighth Circuit has cautioned that comparing damage awards from other cases is of limited utility and in some cases may rise to the level of an abuse of discretion. *Gonzalez v. United States*, 681 F.3d 949, 953 (8th Cir. 2012); *McCabe v. Parker*, 608 F.3d 1068, 1080 (8th Cir. 2010). The Court has recognized the wide range of damages which may be awarded by a jury in addressing pain and suffering:

> We have previously stated:
>
>> Assessment of damages is within the sound discretion of the jury. Each case is evaluated by a different, randomly selected group of individual jurors.
>>> [W]e must expect substantial disparities among juries as to what constitutes adequate compensation for certain types of pain and suffering. This is a litigious fact of life of which counsel, clients and insurance carriers are fully aware. Once they place their fate in the hands of a jury, then they should be prepared for the result.... They cannot expect the Court to extricate them in all cases where the award is higher or lower than hoped for or anticipated. *Taken Alive v. Litzau,* 551 F.2d 196 (8th Cir. 1977), *quoting Mainelli v. Haberstroh*, 237 F.Supp. 190, 194 (M.D.Pa. 1964), *aff'd* 344 F.2d 965 (3rd Cir. 1965).
>
> *Vanskike v. Union Pacific Railroad Co.,* 725 F.2d 1146, 1150 (8th Cir. 1984).

*Morrissey v. Welsh Co.*, 821 F.2d 1294, 1301 (8th Cir. 1987). The same is true of wrongful death damages. *Christian Builders, Inc.*, 501 F. Supp. 2d at 1233.

If the Court decides to grant remittitur on a comparison basis, it must "remit the award to the *maximum* amount identified as within the reasonable

range." *McCabe*, 608 F.3d at 1081. In doing so, the court must also consider inflation and adjust the remittitur accordingly. *McCabe*, 608 F.3d at 1082-83.

In addition, the Court should consider the impact of verdicts over time as views of damages alter within society in general. *See Christian Builders, Inc.*, 501 F. Supp. 2d at 1233 (recognizing changing views by juries of loss of a loved one). As the Minnesota Supreme Court recognized, the wrongful death cause of action must be construed "liberally *in light of current social conditions*." *Fussner*, 261 Minn. at 354, 113 N.W.2d at 359 (emphasis added).

With these foundational principles then, the Court can evaluate this verdict in light of other verdicts and settlements. In doing so, the Court must keep in mind that the damages the jury awarded were for both the wrongful death and the federal constitutional violation. Defendants make no argument about comparable federal constitutional verdicts. Defendants assert that anything more than $1,000,000 is excessive based upon comparison to two verdicts in 2011 and 2015. In doing so, they ignore numerous larger verdicts.

In *Adams v. Toyota Motor Corp.*, CIV. 10-2802 ADM/JSM, 2015 WL 3742898, at *3 (D. Minn. June 15, 2015), *aff'd in part, rev'd in part*, 859 F.3d 499 (8th Cir. 2017), *opinion vacated and superseded on reh'g*, 867 F.3d 903 (8th Cir. 2017), *as corrected* (Aug. 14, 2017), *withdrawn from bound volume* (Aug. 15, 2017), and *aff'd in part, rev'd in part*, 867 F.3d 903 (8th Cir. 2017), *as corrected* (Aug. 14, 2017), the

district court confirmed a $4,000,000 verdict for wrongful death damages involving a teen. In *Dubuque v. Cumberland Farms, Inc.*, 93 Mass. App. Ct. 332, 354, 101 N.E.3d 317, 335 (2018), the Court affirmed remittitur from a verdict of over $32,000,000 to $20,000,000 for the wrongful death of a wife and mother of one child. In *E. Bermingham, As Trustee of N. Bermingham v. Estate of V. Eid N.P.; Emergency Care Consultants*, JVR No. 1709190015 2017 WL 4142085 (Minn. Dist. Ct.) (Verdict and Settlement Summary) a jury awarded $20,600,000 for the death of a mother and wife. In each, even where the court found remittitur appropriate, the unquantifiable value of the decedent's lives was well above the $1,000,000 valuation to which the Defendants ask this Court to reduce the award.

And then, of course, are the settlements that are well known.[5] Minneapolis paid a $20,000,000 settlement in 2019 for the killing of Justine Ruszczyk, who was shot and killed by a Minneapolis police officer after calling 911.[6] The family of Breonna Taylor received $12,000,000. The family of Andre Hill received $10,000,000. The family of Philando Castile received $2,995,000 from the City of

---

[5] See *A Look at Big Settlements in U.S. Police Killings*, The Associated Press, March 12, 2021, htts//apnews.com/article/shootings-police-trials-lawsuits-police-brutality-2380f38268a504ae689ad5b64b5de2e7, last accessed on November 3, 2023; and *Largest Legal Settlements Against Police*;, Huffington Post, September 11, 2016, htts//www.huffpost.com/entry/largest-legal-settlements_b_812220, last accessed on November 3, 2023.

[6] See *Minneapolis Council Approves $27M Floyd Family Settlement*, MPR News, https://www.mprnews.org/story/2021/03/12/minneapolis-council-meeting-to-discuss-floyd-family-settlement, last accessed on November 8, 2023.

St. Paul.  The family of John Pope received $7,500,000.  The family of Daunte Wright received $3,2500,000.  The family of Laquan McDonald received $5,000,000.  The family of Freddie Gray received $6,400,000.  The family of Tamir Rice received $6,000,000.  The family of Eric Garner received $6,000,000.  And, of course, the City of Minneapolis paid $27,000,000 arising from the death of George Floyd.  None of these cases went to trial, meaning none of those families were forced to undertake the considerable effort in preparing for and participating in a trial to determine whether their loved one's life was taken without justification.  Each of these settlements are part of the "current social conditions" *Fussner* instructs the courts to consider.  *Fussner*, 261 Minn. at 354, 113 N.W.2d at 359.

Taking these verdicts and settlements into consideration, wrongful death settlements in Minnesota and elsewhere are significant.  Some exceed the award here.  Nothing from that comparison suggests that the amount awarded here should shock the judicial conscience enough to justify remittitur.  And, even if it did, the minimum amount would be the $27,000,000 George Floyd settlement, an amount greater than the jury award here.

As a result, whether considered on the merits or based upon a comparison to other verdicts and settlements, the jury verdict here should be upheld.  The Motion seeking remittitur should be denied.

3. <u>A new trial is not warranted given the minimal nature of the alleged errors.</u>

In addition to seeking a new trial based upon an inconsistent, the Defendants seek a new trial due to several alleged errors during the trial. "[A] litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." M*cDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (quotations omitted). A review of each of those claimed errors demonstrates that they do not justify relief. The Defendants' Motion thus should be denied.

Initially, the Defendants introduce this section of their Memorandum arguing that the damage award demonstrates passion and prejudice, justifying a new trial on liability. (Defendants' Memorandum, page 10). Such an argument ignores the procedural history of this case. The trial was bifurcated. The jury decided liability *before* hearing any damages evidence or receiving instructions on those damages. The damages could thus not taint the jury in any way.

Further, the argument ignores the jury verdict. The jury fund that one of the involved Officers was not liable. A jury basing liability on something other than the law would not do so.

Thus, this Court should reject the attempt to include the damages verdict as part of its analysis of the liability verdict. They were separated by this Court, without objection, and the jury reached separate conclusions without damages evidence to consider when it resolved the liability issues. Further, the damages

24

verdict reiterated the jury's finding on the liability verdict when the jury confirmed that it found Younce's actions rose to the level of willful or malicious conduct required to impose punitive damages.  (T-459-61; 468-73).

       a.  The evidentiary rulings were proper and within this Court's discretion.

To justify a new trial based on errors in evidentiary rulings the moving party must establish not only the error, but also that the error "prejudicially influenced the outcome of the trial."  *Cortel v. Dorel Juvenile Grp.*, 827 F.3d 804, 807 (8th Cir. 2016).  The goal is to avoid a "miscarriage of justice."  *Cortel*, 827 F.3d at 807.  The courts will not reverse a jury verdict where the error is harmless. Fed.R.Civ.P. 61; *Carolan v. J.I. Case Co.*, 102 F.3d 344, 346 (8th Cir. 1996).

> Thus, '[w]here the district court errs in admitting evidence, we will only grant a new trial or set aside a verdict if there is a clear and prejudicial abuse of discretion.' *Lovett ex rel. Lovett v. Union Pac. R.R. Co.,* 201 F.3d 1074, 1080 (8th Cir. 2000). An abuse of discretion occurs when the error prejudicially influences the outcome of the case, *see id.,* and the burden of showing prejudice rests on the party asserting it. *See Tyler v. White,* 811 F.2d 1204, 1207 (8th Cir.1987).

*Qualley v. Clo-Tex Int'l, Inc.,* 212 F.3d 1123, 1127–28 (8th Cir. 2000).  An error is prejudicial "when that error was so prejudicial as to affect that party's substantial rights, *Pointer v. DART*, 417 F.3d 819, 822 (8th Cir. 2005) (citation omitted)."  *St. Jude Med. S.C., Inc. v. Hanson*, CV 13-2463 (RHK/BRT), 2015 WL 7069650, at *3 (D. Minn. Nov. 13, 2015).

Applying these standards here demonstrates no prejudicial error occurred. The Motion should be denied.

### 1. Exclusion of evidence of drugs in Handy's system.

Defendants first raise an issue based upon its inability to cross-examine Blakney about the drugs allegedly consumed by Handy that night. (Defendants' Memorandum, page 13). Defendants assert they were prejudiced because they did not have the opportunity to cross-examine Blakney about those issues. The court did not err.

First, the Court allowed testimony about the presence of drugs in Handy's system and the impact of those controlled substances. Expert testimony from Ms. Papsun about those substances was allowed. (T-492, 494, 495-96, 500). The evidence of drugs present in Handy's apartment also was properly excluded from the liability phase of the trial because the Defendant Officers had no knowledge of drugs in Handy's apartment, having never entered it, and had no knowledge of Handy consuming any substances when they began pursuing him in the street. (T-205-06).

Second, counsel for the Defendants knew that the Court was reconsidering its position on the testimony about drugs in Handy's system. (T-51-53). Instead of requesting that Blakney be held under subpoena pending a ruling, or securing

26

a ruling before she was released, Defense counsel affirmatively agreed to her release.  (T-86-87).  Even assuming that not allowing Blakney to be cross-examined on this topic was error, it is thus invited error, waiving the right to allege that error.  *United States v. Corn*, 47 F.4th 892, 895 (8th Cir. 2022), *cert. denied,* 143 S. Ct. 1093 (2023).

Third, the Defendants were allowed to use the impeaching evidence during the damages portion of the trial.  (Defendants' Memorandum, page 14).  Yet, they assert that the damages are excessive.  That the jury awarded substantial damages despite the impeaching evidence demonstrates it had minimal probative value.

Finally, and most significantly, the Defendants seek to use the evidence as impeachment evidence.  (Defendants' Memorandum, page 13-14).  Merely impeaching evidence does not justify a new trial.  *United States v. Coplen*, 565 F.3d 1094, 1096 (8th Cir. 2009).

This Court should deny the Motion for a new trial on this basis.


2.   Evidence of Handy's criminal history and charges.

The precise basis for this objection is not clear.  The jury received evidence of Handy's Illinois criminal record, Ex. D-37.  This Court did exclude evidence of pending Minnesota State charges.  (T-703-704).  The Court determined that its

prejudicial effect outweighed any probative value pursuant to Rule 403, especially since it was merely an information, the words of an attorney, rather than an indictment. (T-703-704). The Defendants' argument fails for two reasons.

First, the Defendants make no argument about the balancing effort this court undertook. Absent an argument that the district court abused its discretion, no error can be assigned. *Letterman v. Does*, 859 F.3d 1120, 1127 (8th Cir. 2017). Under Federal Rule of Evidence 403, evidence may be excluded "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues," or "wasting time." *Trotter v. Lawson*, 997 F.3d 819, 821 (8th Cir. 2021). Absent such an analysis, the issue is waived. *Meidinger v. Ragnone*, 661 Fed. Appx. 449, 452 (8th Cir. 2016) *(See Chay–Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim in his opening brief, it is waived."); *see also Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) ("This court does not consider issues raised for the first time on appeal in a reply brief 'unless the appellant gives some reason for failing to raise and brief the issue in his opening brief.' " (quoting *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 421 n.5 (8th Cir. 2005))).).

Second, on the merits, since the proffered evidence was just a set of criminal charges made by a prosecutor, the evidence had minimal probative value as this Court recognized.

Introduction of that evidence further suffered from the defects that Handy did not plead guilty or otherwise admit to any of the wrongdoing. A criminal defendant is presumed innocent until proven guilty beyond a reasonable doubt. *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978). Since he was deceased, the facts surrounding those allegations could not be effectively rebutted. The prejudice was thus high.

The Defendants make assumptions that a conviction for those charges would have resulted in a return to prison and that it evidenced a return to his pattern of criminality. Neither, of course, is supported by the mere assertion of charges by a prosecutor. The results of those charges, including a sentence if any, are mere speculation. The response by the Salvation Army to Handy's conviction is unknown and again, mere speculation. The criminal charges have nothing to do with Handy's physical health. The asserted use for the evidence thus relies upon mere speculation. *See Hickerson v. Pride Mobility Prod. Corp.*, 470 F.3d 1252, 1259 (8th Cir. 2006) (circumstantial evidence is sufficient but "the shown circumstances must be such that the facts necessary to support the finding

may be inferred and reasonably must follow, that the existence of such facts may

not depend upon guesswork, conjecture and speculation").

Given the record in this case, and the minimal argument by the

Defendants, no error occurred.  A new trial on this basis is not warranted.

### 3.   Evidence of Jill Millner's shoplifting convictions.

Defendants next seek a new trial based upon the exclusion of shoplifting

convictions involving Mollner from 2013 and 2014.  The Court excluded them.

(Pretrial Hearing Transcript, page 16).  No error occurred for two reasons.

First, the convictions were for misdemeanors over 9 years old at the time

of this trial.  Contrary to the statement in the Defendants' Memorandum, the

courts have addressed a shoplifting conviction:

> With respect to the crimes here being admissible as convictions under
> Minn. R. Evid. 609, in *State v. Darveaux*, 318 N.W.2d 44, 48 (Minn. 1982), the
> Supreme Court held that shoplifting is not a conviction involving
> dishonesty or false statement under Rule 609(a)(2). In *United States v.
> Ortega*, 561 F.2d 803, 806 (9th Cir. 1977), a federal circuit court likewise
> concluded that shoplifting is not a crime involving dishonesty or false
> statement under Fed. R. Evid. 609(a)(2). *Id.* (stating "Human experience
> does not justify an inference that a person will perjure himself from proof
> that he was guilty of petty shoplifting... [a]n absence of respect for the
> property of others is an undesirable character trait, but it is not an
> indicium of a propensity toward testimonial dishonesty").

*Yeo v. Janssen*, 15-2748 (MJD/JJK), 2016 WL 3960358, at *6 (D. Minn. Apr. 1, 2016),

*report and recommendation adopted,* 15-2748 (MJD/JJK), 2016 WL 3962853 (D. Minn.

30

July 20, 2016).  Under Minnesota law, the convictions thus do not implicate

dishonesty or a false statement.  And at least two federal courts have excluded

shoplifting evidence.  This Court should follow suit.

Further, the evidence is offered solely for impeachment purposes.  Merely

impeaching evidence does not justify a new trial.  *Coplen*, 565 F.3d at 1096.

No error occurred.  The new trial Motion on this basis should be rejected.


4.  Exclusion of the officers' subjective opinions.

This Court excluded the subjective opinions of the Officers based upon the

legal standard to be proven – whether the use of force was objectively

reasonable.  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).  No

error occurred.

First, the subjective opinions of the officers are irrelevant.  *See Hannah v.

City of Overland, Mo.*, 795 F.2d 1385, 1390 (8th Cir. 1986), *abrogated by Green v. Bock

Laundry Mach. Co.*, 490 U.S. 504, 109 S. Ct. 1981 (1989) ("If there was probable

cause to arrest Hannah, based on an objective reasonableness standard, the

subjective motivations of the arresting police officers are irrelevant.").

Second, the officers were allowed to testify about their observations of

Handy and the reason that they opened fire.  In fact, the ultimate issue for the

jury was not really disputed given the experts' testimony – if Handy pointed a

31

gun at one of the Officers, they were justified in firing; if he did not, they were

not.  As a result, the only evidence determinative of the liability questions was

based upon Handy's actions and the physical evidence, not the subjective

opinions of the Officers.

Since no error occurred, this part of the Motion does not form the basis for

a new trial.  It should be denied.

### 5.  Exclusion of expert psychopharmacology testimony.

Defendants further object to the exclusion of expert opinion about the

impact of drugs on Handy in particular.  The Court allowed the expert to testify

about the general effects of the drugs and, of course, the jury heard about

Handy's behavior that evening, including testimony that he was behaving in an

unusual way.  (T-60, 62-64).  Prior to the opening statements, the colloquy set the

proposed testimony of Ms. Papsun, the proposed expert:

> THE COURT: My understanding is that your expert is
> going to give a hypothetical case, not an opinion about
> Mr. Handy.
> MR. EDWARDS: She's not going to give an opinion about him. She's
> going to say the nature --
> THE COURT: Oh, she. I'm sorry.
> MR. EDWARDS: It's a she. That's okay. The nature of the drug he
> was on and the effect that it has and that his behavior was consistent
> with that.
> THE COURT: See, that, I think, has limited relevance to show
> context. Now, I'll think about it on the break, but I want you guys to
> take a break too.

(T:53). Ms. Papsun then testified:

> Q. Ms. Papsun, do you have an opinion to a reasonable degree
> of scientific certainty whether Mr. Handy's actions on the night in
> question were consistent with the intoxication by N-Ethylpentylone?
> A. Violent and aggressive behavior, paranoia, hallucinations, and
> psychosis are all consistent with effects by N-Ethylpentylone.

(T:500). Given the lay testimony about Handy's actions that night, that they were

unusual, that he was hearing voices and seeing things, the lay testimony

combined with the expert opinion of "consistent with" intoxication by N-

Ethylpentylone, the point was made to the jury.

Defendants argue that this was, in effect, a late *Daubert* motion. *Daubert*

does not address relevance and other bases for excluding testimony: "[t]he main

purpose of *Daubert* exclusion is to protect juries from being swayed by dubious

scientific testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613

(8th Cir. 2011). This Court limited the testimony based upon its assessment of

the evidence necessary to give the jury "context" about what occurred. (T-48-

49). It was thus not addressing the nature of the expert's testimony and its

standards within the scientific community; it was deciding relevance. As such,

the entire argument by the Defendants misses the mark.

Given the arguments in the Motion and the reasonable limitation placed

by the Court, no error occurred. The new trial motion on this basis should be

rejected.

       b.  The closing arguments were not prejudicial.

In addressing a motion for a new trial based upon allegations of an

improper closing argument, the Court applies a very restrictive review:

> "When a new trial motion is based on improper closing arguments, 'a new trial should be granted only if the statements are plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict.'" *Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947, 954 (8th Cir. 2014) (quoting *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002)). It will be a "rare case[ ]" when this court finds that a party has "made a sufficient showing of prejudice caused by 'plainly unwarranted and clearly injurious' closing argument." *Gilster v. Primebank*, 747 F.3d 1007, 1008 (8th Cir. 2014) (quoting *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1303 (8th Cir. 1987)).

*Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 556 (8th Cir. 2017). "[O]ratorical

exaggeration and provocative remarks in the closing arguments" are insufficient

to justify a new trial because "jurors are intelligent, discerning people and ... can

usually sort out emotional and passionate arguments and follow what the court

tells them to do." *Vanskike v. Union Pac. R. Co.*, 725 F.2d 1146, 1149 (8th Cir. 1984).

In addressing the nature of the harm, the Eighth Circuit has looked to four

factors:

> When deciding whether to grant a new trial due to improper remarks by counsel, we consider whether: (1) "the remarks in question 'were ... minor aberrations made in passing'"; (2) the district court took "'specific curative action'"; and (3) "'the size of the damage award ... suggest[s] that counsel's comment had a prejudicial effect.'" *Gilster v. Primebank*, 747 F.3d 1007, 1011–12 (8th Cir. 2014) (quoting *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1131–32 (10th Cir. 2009)). "'[T]he weight of the evidence' is another

relevant factor in determining 'whether the improper argument deprived a party of a fair trial.'" Id. at 1013 (quoting *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 760 (7th Cir. 2013)).

*Ventura v. Kyle*, 825 F.3d 876, 885 (8th Cir. 2016).  Applying these standards, no error occurred.

1.  Nothing in the liability closing argument rises to the level of plainly unwarranted and unfairly prejudicial.

Defendants point to five statements made by Plaintiff's counsel during closing argument.  One of those, bullet three on page 22 of the Defendant's Memorandum, addressed the importance of the jury function in this case.  It was not substantially different than the statement by defense counsel during closing argument:

> You are the ones, the only ones, who get to decide what happened here, who get to decide what justice demands in terms of a verdict in this case.

(T-615).  Nothing erroneous exists about Plaintiff's counsel's statement and, even if so, it is the kind of minor statement that does not justify a new trial.

Two of the statements came from counsel's recollection of the Defendants' expert's testimony, bullets number 2 and 4.  That expert did use the word "hunt."  (T-540, 544).  The comments about that testimony are thus accurate and simply asking the jury to consider the inference to be drawn from his testimony.

The first bulleted point asks that Handy be treated as a human.  Again, it is a single comment in an extensive closing argument.  It asks the jury to do nothing more than it should – treat the victim of the conduct by the Officers as a person rather than a criminal or some other classification that deserves less consideration.  Nothing about it rises to the level of "plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict."  *Smiley*, 859 F.3d at 556.

Finally, Defendants raise the issue of the statement whether the Officers intentionally killed Handy.  Such a concern is certainly present in any case of excessive force.  Counsel did nothing more than correct any misapprehension for the jury about what he believed occurred – a tragic, critical mistake.  Nothing about it rises to the level of "plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict."  *Smiley*, 859 F.3d at 556.

Strikingly, despite the list, the Defendants never argue how the jury would have reached a different verdict because of these statements.  They simply list them and go on.

In the section of the Memorandum on the prejudicial effect of the closing arguments, the Defendants provide no basis for finding these statements problematic, instead focusing on the curative instruction. And, as is discussed

36

above, the nature of the liability verdict itself demonstrates the absence of prejudice.  The jury took the Court's instructions, determined what occurred and found only one officer liable.  If the closing argument had overcome the jury's rational thought process and ability to follow the instructions, the verdict would have been different and they would not have confirmed a second time – when they reached their verdict on punitive damages – that Younce acted willfully or maliciously.

Given the nature of the statements, and the arguments by the Defendants, the liability closing arguments do not meet the requisite standards for a new trial.  The Motion on this basis should be denied.

> 2.  Nothing in the damages closing argument rises to the level of plainly unwarranted and unfairly prejudicial.

Similar to the arguments about the liability, the Defendants list nine comments by Plaintiff's counsel which they find objectionable.  A review demonstrates that none form the basis for a new trial.

The first bulleted comment responds to the Defense argument that Handy had a criminal record and thus his life had less value.  George Floyd is included in that discussion as one of several people who had criminal backgrounds but overcame those limitations.  (T-797).  The Defendants reference two California decisions where the issue of referencing Floyd was addressed.  (Defendants'

Memorandum page 21-22).  The Defendants do not, however, ever argue why

that single reference supports a new trial here.  The reason is apparent – those

California decisions are decidedly different.  In one, responding to a Motion in

Limine, the district court determined:

> Given the factual differences between this case and the deaths of George
> Floyd and Breonna Taylor, and the seeming irrelevance of the 1990s
> Rampart scandal, it is not apparent to the Court why mentioning these
> events would be probative. On the other hand, the potential prejudice of
> such inflammatory references in a closing argument is apparent. On
> balance, the risk of unfair prejudice significantly outweighs the probative
> value, and the Court therefore **GRANTS** Defendants' MIL No. 2 as to
> these references.

*Mouradian v. City of Los Angeles*, CV213880DMGSHKX, 2023 WL 2558398, at *4

(C.D. Cal. Jan. 25, 2023).  In the other, the district court allowed references to the

Floyd case under tight limitations.   *Alves v. Riverside Cnty.*,

EDCV192083JGBSHKX, 2023 WL 2983583, at **5-6 (C.D. Cal. Mar. 13, 2023).

Even if argued, therefore, the California decisions offer no basis for relief in this

case.

The second, again, noted that the jury was there to provide justice in this

case.

The third is an accurate statement.  The Defendants showed no remorse or

other contrition for their wrongdoing as decided by the jury.

The fourth is accurate.  Handy's Mother suffered a huge loss after his

death according to the trial testimony.

The reference to money as a means of deterring future wrongful conduct goes directly to the punitive damages to be considered by the jury and was argued specifically for the purpose of explaining punitive damages sought in Plaintiff's closing argument. (T-808-09, 811).

The final four statements relate to the impact of the jury's verdict on future conduct. They are precisely the kind of "oratorical exaggeration and provocative remarks in the closing arguments" that do not form the basis for a new trial. *Vaniskike*, 725 F.2d at 1149.

In a footnote, the Defendants object that the argument implied that the City would indemnify the individual officers for any amount awarded. The single statement, even if it did so, is insufficient to award a new trial. But, it did not. The statement says nothing about the City. It specifically references the St. Paul Police Department, whom these officers represented, understanding that this is a real case. And that a family had been destroyed. Moreover, as previously stated, the fact that St. Paul was vicariously liable for the officer's conduct was never disputed in this case. Nothing implied indemnification.

"[J]urors are intelligent, discerning people and ... can usually sort out emotional and passionate arguments and follow what the court tells them to do." *Vanskike*, 725 F.2d at 1149. Consideration of the statements under the applicable

standards, therefore, shows that they are supported by the evidence and in no way reach the high threshold for a new trial.

The Motion for a new damages trial on this basis should be denied.

3.    The general instruction was sufficient.

Defendants next object that the general instructions to the jury were insufficient.  Initially, it should be noted that the jury heard the instructions about arguments of counsel not being evidence on three occasions – before the trial began (T-4) and after each phase of the trial (T-658-59, 830).

The argument about the insufficiency of the jury instructions at page 25 of the Defendants' Memorandum does not address any of the comments it addressed in the recitation of objectionable statements.  Those statements therefore do not form the basis for a new trial.

The one specific objection was the request for an instruction that negligence was not sufficient.  The jury was instructed by the Court with the specific legal standard and what the Plaintiff had to prove.  The jury was told the Court would give the jury the law.  (T-3, 657).  The jury is presumed to follow the court's instructions.  *Muhammad*, 536 F.3d at 938.

Ultimately, the jury had a single fact issue to resolve – did Handy point a gun at one of the officers.  The resolution of that issue was determinative under

all of the testimony the jury heard.  No error occurred.

4.       The size of damages fails to show any prejudicial effect.

Defendants argue the size of the verdict shows the prejudicial effect of the

closing argument.  Defendants' argument regarding the supposed prejudicial

effect of Plaintiff's closing is really a recasting of the assertion that this was an

excessive verdict.  As is demonstrated above, it was not.

Again, "jurors are intelligent, discerning people and ... can usually sort out

emotional and passionate arguments and follow what the court tells them to do."

*Vanskike*, 725 F.2d at 1149.  The Motion should be denied on this basis.

5.   The alleged close nature of the evidence does not justify a
     new trial.

The next argument asserts that the evidence was close.  As is discussed

repeatedly above, the jury had a single question to answer to determine liability -

did Handy point a gun at one of the officers.  The resolution of that issue was

determinative under all of the testimony the jury heard.

And on that issue, the evidence was not close.  Two competing stories

were considered by the jury.  The Officers testified that Handy pointed a gun; the

lay witnesses testified that he did not.  The lay testimony was supported by the

only pathologist to testify, Dr. Ronald Wright – a forensic pathologist with fifty-

three years of experience – who testified that based on the wounds observed on
Handy's body after the shooting: (1) the bullet wounds are "consistent with
somebody who is down on the ground with their legs up" while being shot; (2)
the injuries to his palm make it impossible that he was holding a gun in his hand
when he fell to the ground; (3) a person would not be able to hold a firearm in his
hand after sustaining the gunshot wound observed on Handy's forearm; and (4)
to a reasonable degree of medical certainty, Handy was not holding a gun at the
moment he was shot through the forearm. (T-271; 302-03).  This evidence was
never contradicted by either of the Defendants' two expert witnesses, with only
the Defendant Officers challenging Dr. Wright's conclusions with their testimony
about Handy pointing a gun.

Even Younce's testimony was not unequivocal.  When cross-examined
regarding his ability to recall specific details about the sequence of the shots
fired, Handy's positioning when shot, and whether Defendant Younce's
"perception" of the events of the shooting was correct based on inconsistent
statements he provided to investigators, Younce candidly replied: "That's what I
perceived to happen. They asked me what I thought happened, and that's what I
perceived." (T-201-02).  When asked whether his perception of events was
correct, Younce confirmed that his perceptions of what happened during the
shooting were wrong: "Was my perception correct compared to the video that

42

shows what actually happened? No, what actually happened on the video where I was shooting in one stationary position would have been correct." (T-202). When pressed regarding the incorrect recollection of events that he initially reported to investigators, Younce stated: "I still see it in my head that way, but that's not how it occurred. So it – when the memory – the memories get a little tainted when I have evidence in front of me in that regard." (T-203).

Nothing is "close" about the liability decision. It is simply one where the jury performs its essential function of determining credibility. *United States v. Trotter*, 837 F.3d 864, 868 (8th Cir. 2016).

This argument fails to present a basis for a new trial.

### 6. Punitive damages were properly decided by the jury.

Finally, Defendants object that the jury was allowed to consider the issue of punitive damages for wrongful death as well as the constitutional violation. They base this argument on the failure of Plaintiffs to take the procedural steps necessary to assert a claim for punitive damages under Minnesota law. Minn. Stat. § 549.191. The argument fails for several reasons.

First, the step is merely procedural. This Court has held it is not error to allow a claim for punitive damages to be made in the initial complaint. *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 765–66 (D. Minn. 2022).

Second, Defendants assert no prejudice from the failure to have a formal motion to amend the Complaint; Defendants never brought a motion to strike that allegation. Instead, the parties recognized punitive damages could be awarded under federal law. By allowing the issue of punitive damages to go to the jury, over the procedural objection, this Court effectively determined that the required showing under State law was made. *See Jensen v. Walsh*, 623 N.W.2d 247, 251 (Minn. 2001) (addressing the basis for punitive damages under the statute).

Finally, Defendants never sought to divide the punitive damages between the two causes of action, just as they did not seek to do so in relation to the compensatory damages.[7] The jury was thus awarding punitive damages under both theories. It is impossible to distinguish between the punitive damages awarded under each theory. It is thus improper to alter the verdict on this basis. *See Adams*, 867 F.3d at 921 (impossible to tell damages awarded for past versus future pain and suffering given single damage amount, thus prejudgment interest could not be awarded).

The punitive damages award, therefore, was not erroneous. The Motion for a new trial on this basis should be denied.

---

[7] In their various Motions, Defendants do not address whether the punitive damages award is excessive. As such, it must stand.

44

4.  <u>No legal basis exists to amend the judgment to $1,000,000.</u>

In its final effort to secure relief from the justified jury verdict, Defendants request that this Court amend the judgment pursuant to Fed. R. Civ. P. 59(e).

> "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the summary judgment motion. The nonmovant has an affirmative duty to come forward to meet a properly supported motion for summary judgment.... Nor should a motion for reconsideration serve as the occasion to tender new legal theories for the first time." *Rothwell Cotton Co. v. Rosenthal & Co.,* 827 F.2d 246, 251 (7th Cir.), *as amended,* 835 F.2d 710 (7th Cir. 1987) (quoting *Keene Corp. v. International Fidelity Ins. Co.,* 561 F. Supp. 656, 665–66 (N.D.Ill. 1983), *aff'd,* 736 F.2d 388 (7th Cir. 1984)).

*Hagerman v. Yukon Energy Corp.,* 839 F.2d 407, 414 (8th Cir. 1988).  The Rule gives a district court the chance "to rectify its own mistakes in the period immediately following" its decision. *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 450, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982). Here, the Defendants do not assert any newly discovered evidence or other error of law or fact by this Court. Instead, they simply repeat their arguments that the jury verdict is not supported by the evidence and that other errors occurred.

Strikingly, they do not seek a new trial, but merely remittitur.  As such, any arguments about the liability decision by the jury are not encompassed in this Motion.

Since it is nothing but a different theory to seek relief to which the Defendants are not entitled, remittitur, under their other arguments, they are not entitled to relief under this Rule either. The Motion should be denied and this Court should not alter the judgment. *Hagerman*, 839 F.2d at 414.

5. <u>The Court should exercise its discretion in deciding whether to stay enforcement pending appeal and, if so, the conditions appropriate for that stay.</u>

The Defendants seek a stay pending appeal. Whether to grant a stay is in the sound discretion of the district court. *Krekelberg*, 439 F. Supp. 3d at 1163. The burden is upon the party seeking to avoid a bond requirement to prove it is not necessary. *Krekelberg*, 439 F. Supp. 3d at 1163. Here, the Defendants argue that they need not post a bond since under Minnesota law no bond would be required for a political subdivision. In doing so, they assert that the judgment is a lien on the property of the City. The record, however, contains no evidence of the real property owned by the City nor of any obligations which may attach to that property. As a result, this Court cannot determine if, in fact, the judgment is an effective lien on the real estate owned by the City.

In addition, of course, the judgment is also against Office Younce. He is not covered by the protections of Minnesota law regarding a bond for a

governmental body.  As a result, this Court should examine the factors relevant

to the requirement for a bond.

> Factors to consider in determining whether a supersedeas bond may be waived include: (1) the complexity of the collection process, (2) the amount of time required to obtain a judgment on appeal, (3) the degree of confidence that the district court has in the availability of funds to pay the judgment, (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money, and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place the other creditors of the defendant in an insecure position. *Glob. Traffic Techs., LLC v. Morgan*, Civ. No. 10-4110, 2014 WL 3513149, at *1 (D. Minn. July 16, 2014).

*Krekelberg*, 439 F. Supp. 3d at 1163.

The record contains no evidence of the financial status of Officer Younce.

The City's promise to indemnify him is only as good as the ability of the City to

fulfill that promise.  As a result, these factors all point towards requiring a bond

in this case.

The five factors point to issues for this Court to consider:

> 1. The complexity of collection.  Collection from real estate is a
>    complex process.  It requires a complete foreclosure action, the
>    results of which are uncertain.  The City asserts it keeps a fund
>    for judgments and attorneys' fees, but does not disclose the
>    amount of that fund or other claims which might drain it.  Nor is
>    there any assurance that the City will continue to maintain such a

47

fund in uncertain economic times.    For example, the budget

report at page 19 acknowledges:

> The 2024 proposed budget maintains compliance with
> the City fund balance policy, using a combination of
> ongoing and one-time solutions to balance the budget.

> The City assumes over the long-term that impacted
> revenues will continue the recovery started in 2021,
> allowing the City to replace one-time budget solutions
> with ongoing sustainable revenues in the future.

Plaintiff should not be in a position of assuming the risks the

City's financial position creates.  If the fund is insufficient to

cover this judgment, collection will require finding accounts of

the City, determining if those accounts contain funds available to

pay the judgment and then to garnish or otherwise pursue

collection from those accounts.

2.  Time to obtain judgment on appeal.  During that process, the

judgment earns interest at 10 percent per annum, or $1,150,000 in

the first year, $1,265,000 in the second and so on.  Minn. Stat. §

549.09.

3.  Confidence of future funds to pay the judgment.  While the

record supports a view that the City is solvent today, nothing

demonstrates that solvency will continue for the years an appeal

can take.  Cities have declared bankruptcy and future claims

brought against the City could place its solvency at risk.

4.  Clarity of ability to pay.  The bond ensures prompt and easy

collection of a judgment.  Having to pursue collection from the

City or Officer Younce is a more complex and time-consuming

process.  The City has not disclosed the amount in its litigation

reserve fund nor what other claims may be made against that

fund.

5.  Financial condition of the City.  Again, the City appears solvent

from its current fiscal status.  The City offers nothing more than

past practices and its bond rating to assure the Court of the

nature of its finances going forward.

The record, in this case, therefore, is sparce.  While it may rise to the level

sufficient for the Court to issue the stay without a bond, the record also raises

significant issues this Court should address.

The Court should further consider some other form of security.  Fed. R.

Civ. P. 62(b) allows for "other security."  For example, the City could be ordered

to deposit with the Court sufficient funds to cover the judgment and interest for

the two or three years this appeal may take.  In that way, Plaintiff is assured of

collection of most if not all of the judgment. And, if the Defendant is successful in whole or part, the funds can be distributed to both parties.

Given this record, the Court should consider imposing some form of security for a stay pending appeal.

## CONCLUSION

This matter is before this Court pursuant to the post-trial motions brought by the Defendants. A review of the record demonstrates that no basis exists to alter the existing judgment – liability and damages are fully supported by the record. In addition, the errors alleged during trial are insufficient to warrant a new trial. This Court, therefore, should affirm the jury verdict.

Dated this 10th day of November, 2023.

                ___/s/ Kenneth R. White_____
                Kenneth R. White, No. 141525
                LAW OFFICE OF KENNETH R. WHITE, P.C.
                212 Madison Avenue, Suite 200
                Mankato MN  56001
                507/345-8811
                kenwhite@kennethwhitelaw.com

                *Attorney for Plaintiff*

/s/ Kevin W. O'Connor
Kevin W. O'Connor, ARDC No.: 6216627
O'Connor Law Firm, Ltd.
100 S. Wacker Drive, Suite 350
Chicago, Illinois 60606
P: (312) 906-7609
F: (312) 263-1913
firm@koconnorlaw.com

*Attorney for Plaintiff*

/s/ Paul J. Bosman
Paul J. Bosman, No. 0388865
2136 Ford Parkway, #5328
Saint Paul, MN  55116
651/485-7046
paulbosman@cuapb.org

*Attorney for Plaintiff*